## CAPITAL TRACTION CO. v. SNEED.

Court of Appeals of District of Columbia.

Submitted February 8, 1928. Decided April 2, 1928.

Petition for Rehearing Denied April 28, 1928.

No. 4615.

1. Appeal and error ☞977(5)—Refusal of motion for new trial is not available as assignment of error, unless abuse of discretion.

Refusal to grant motion for a new trial is not available as an assignment of error, unless such refusal amounts to an abuse of discretion.

2. Release ☞58(6)—Question as to being chargeable with knowledge of untruthfulness of representations by claim agent at time of securing release held for jury.

Whether plaintiff, in action against street railroad to recover for personal injuries alleged to have resulted from premature starting of street car, was chargeable with untruthfulness of representations made to her by claim agent at time of securing release, held for jury under evidence.

3. Release ☞58(6)—Whether release for injuries was secured by fraudulent representation held for jury.

In action to recover against street railroad for injuries alleged to have resulted from premature starting of car, testimony relative to whether plaintiff was induced to sign a release by fraudulent representation of claim agent held to require submission to jury.

4. Release ☞21—One seeking to repudiate release on grounds of fraud will be deemed to have ratified it, unless acting promptly on discovering fraud.

One seeking to repudiate a release of liability for personal injuries on the grounds of fraud, on discovery of fraud must act promptly, or he will be deemed to have ratified it.

5. Release ☞58(1)—Laches or undue delay in renouncing release of liability for personal injuries after discovery of fraud held for jury.

In action to recover for personal injuries alleged to have been received by street car passenger because of premature starting of car, evidence as to laches or undue delay in renouncing release after discovery of fraud constituting ratification held to require submission to jury.

Robb, Associate Justice, dissenting.

Appeal from the Supreme Court of the District of Columbia.

Action by Mabel P. Sneed against the Capital Traction Company. Judgment for plaintiff, and defendant appeals. Affirmed.

F. J. Hogan and E. L. Jones, both of Washington, D. C., for appellant.

A. L. Newmyer and M. W. King, both of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, ROBB, Associate Justice, and BLAND, Associate Judge of United States Court of Customs Appeals.

BLAND, Acting Associate Justice. This is an appeal from a judgment for $18,000, and interest and costs, in the Supreme Court of the District of Columbia, in a personal injury case, in which the chief and important question submitted for our decision is: When is the alleged ratification of a written release, procured by fraud, a question of fact for the jury, and when is it a question of law for the decision of the court, upon motion for directed verdict?

The question of ratification, as well as the validity of the release, regardless of its ratification, being involved, necessitates a somewhat extended statement of the evidence. The material portions of the evidence, necessary for our decision in the case, are as follows:

Plaintiff claims injury, at 8:10 p. m. on November 16, 1923, by a premature starting of one of defendant's street cars at New Jersey avenue and C street, N. W., in the District of Columbia. Plaintiff was employed at the Interstate Commerce Commission, and lived at the Government Hotels on the Union Station Plaza, A and B Buildings, near the corner of New Jersey avenue and C street. Plaintiff approached a car, which was standing at New Jersey avenue and C street. She walked around the rear of same, and was standing in front of the door when the conductor opened it. She started to get on the car, but before she had gotten both feet on the platform the car was started suddenly, and she grabbed the dividing rail on the rear platform. Her coat was fastened by the premature closing of the door. She continued to hold to the dividing rail for about a block, when the car went around a sharp curve at First and C streets, when she was thrown to the platform. It was an unreported or blind accident, and no witnesses testified concerning the incidents of receiving the injury, except plaintiff.

Plaintiff continued to the Business High School and returned home on a street car. She was suffering with her back when she returned, and a friend came and bathed her back with witch hazel, and also bathed her hand, which was swelling badly. There was a bruised spot in the small of her back. Prior to the injury plaintiff had been a healthy and active woman, with the exception of the fact that she had had two prior operations for tumor, one in 1915 for fibroid tumor in the uterus, and the other in Decem-

ber, 1920, for a lymphatic tumor in her side. She had never had a pain in her back in her life prior to the injury.

Plaintiff was educated in the rural schools of Kansas and had a second-grade certificate for teaching school, which was equivalent to High School. She later received a diploma for attending a night school. She taught school in the rural schools of Kansas for 5 years, and while teaching became a stenographer and typist, receiving her first position in Kansas City, when she was 27 or 28 years old, as a typist, with the R. G. Dun Mercantile Agency. She then took a position with a credit clearing company. When she was in her early 30's she worked in a lawyer's office, in Kansas City, acting as his secretary, stenographer, and typist. She worked for an importing and extracting company for about 3 years, and then for a fire insurance company running a business service bureau. She later took a position with the Interstate Commerce Commission in Kansas City, in which position she remained for 8 years, and was then transferred to the Commission's office in Washington, where she continued to be employed until some months after the date of her alleged injury. At the time of the trial in the court below, in February, 1927, plaintiff was 53 years of age.

Plaintiff did not go to work on the following day (Saturday), but did return to work on the following Monday (the 19th). On Tuesday, November 20th, the plaintiff did not go to work, but took one day off of her annual leave. She took her annual leave in December and has not worked since January 14, 1924.

When the plaintiff came down to her breakfast on the morning after the alleged accident, she noticed certain lines, in a semi-horizontal position, across the back of her coat which she had worn at the time of the injury. On November 20th she telephoned to the Capital Traction Company and talked to Mr. Wilkinson, of the claim department, and told him she had an accident and thought she was hurt, but that it was probably only temporary; that she did not desire to put in a claim for personal injury, but would want to put in a claim for the damage to the coat. Wilkinson called the same day at the Government Hotels. In getting the coat she walked in a normal way and without apparent pain. She made no claim for personal injury, and explained to him that her back pained her a little, but that she had gotten some liniment from the women in the hotel, with which she had rubbed her back, but that

26 F.(2d)—19½

she thought she ought to be reimbursed for the damage to her coat.

On the same date, November 20th, she telephoned Dr. Jerome S. Crowley and made an appointment to see him that day. She saw Dr. Crowley then and on several occasions later, and during the course of his treatment of her he told her that she had a small tumor on the neck of the bladder. She did not know she had such a tumor until after the doctor's examination. The doctor explained to her that it was not necessary to have it removed, as it would cease to trouble her. On her first visit to the doctor she explained about her fall on the street car, and told him about the pains up and down her spine, and he treated her back. He never told her that the pain in her back was caused by the tumor, but did tell her that the pain that he was treating her for came from the street car injury, and that his treatment was intended to relieve the same.

About a month after the interview with Mr. Wilkinson, defendant's claim agent, she again telephoned the defendant company, talked with Mr. Wilkinson, and told him that her back was still hurting her, and that she wished to put in a claim for personal injury, in addition to her claim for damages for her coat. On this occasion Mr. Wilkinson asked her who her doctor was, and, upon being advised that it was Dr. Crowley, asked if she had any objection to his seeing Dr. Crowley, and she said she had not. On December 27, 1923, Mr. Wilkinson called on Dr. Crowley at his office in Stoneleigh Court Apartments, in Washington City. Dr. Crowley told Mr. Wilkinson that he had found a slight bruise at the lower dorsal vertebra, and that he strapped it, but that it was nothing serious; that he had seen her two or three times, and she was responding readily to treatment. Dr. Crowley also told Mr. Wilkinson that the plaintiff had a small tumor on the neck of her bladder, but that that had nothing to do with the accident. The latter fact we think is conceded in this case, and the tumor was, in fact, removed on February 29, 1924, at the Howard Kelley Hospital in Baltimore, by being burned off or cauterized, and it was done in about 15 minutes and did not require or necessitate her remaining in the hospital after the tumor had been removed. Dr. Crowley's treatment of plaintiff consisted of baking her back with a light for the purpose of removing the pain. Dr. Crowley told plaintiff that he had talked to Mr. Wilkinson about her condition.

According to Dr. Crowley, the plaintiff's

last visit to him was on December 28, 1923. The treatment given by Dr. Crowley, according to plaintiff, was not giving her much relief, and she went to Dr. Sommerwerck, a chiropractor, on December 30, 1923, and complained of the pain in the lumbar region of her back, which she explained was caused by the accident.

Mr. Hill, chief claim agent of defendant, on December 27 tried to get into communication with plaintiff, but was unable to do so, and wrote plaintiff a letter on January 1, 1924, asking her to call him by telephone. On receipt of the letter, plaintiff telephoned Mr. Hill and made an appointment for him to come and see her, which he did, for the first time, on January 5, 1924. The plaintiff thought she had talked with him once or twice, on prior occasions, over the telephone, and that his talk was mainly to the effect that her trouble was due to other conditions, and that her physician, Dr. Crowley, had told him so, and that Dr. Crowley had stated to him that the accident had very little, if anything, to do with her condition.

Plaintiff also testified that between the 5th and 12th of January, 1924, she had several telephone conversations with Mr. Wilkinson, and that Mr. Wilkinson said he was speaking for Mr. Hill. Mr. Wilkinson also had the same opinion as Mr. Hill, and said that he had talked with her doctor, and that her trouble was due to other conditions, and that the injury did not cause the trouble she was having in her back. On one occasion Mr. Hill said to her, "You haven't been to the doctor very much;" and she replied, "Well, the doctor said it was a sprain, and about all I could do was to rest; and what else could I do, when two doctors told me to do that." He replied, "I don't know; I am not a doctor." During this conversation, Mr. Hill said to her, "You can't get anything; you haven't any witnesses; we have no way of knowing whose fault it is, or how."

During this conversation Mr. Hill asked her how much she wanted for her personal injury, and he appeared cross and spoke very angrily, as if she were at fault, and asked her what she wanted. She was feeling very badly, but she replied, "That depends; if I never get well, no amount can really compensate me." He replied, "Your injury is very trifling; your doctor told me so; your trouble is due to other conditions, and you will never be any better until you get rid of those conditions." Upon being asked if she believed what Mr. Hill had said, she said, "Well, I did in a way, and still it was very hard

to think that my own doctor was discussing the matter, without my knowledge or consent, and I didn't think it was necessary for him to tell them about the other condition; in fact, I wondered if he had any right to do so."

Mr. Hill said something about having the railroad company surgeon examine her. She was feeling very badly, but agreed to be examined by the company's physician. He was out of the city, however.

Mr. Hill offered to pay her $150, and she asked him, if he had been injured, if that would cover his damage. She did not accept the $150, and Mr. Hill left. She testified that she thought that, after this visit, and prior to the 12th of January, 1924, she talked to him once or twice over the telephone, from the office, and in those conversations the main thing he said to her was that her trouble was due to other conditions, and that her doctor, Dr. Crowley, had told him that. During the same time Mr. Wilkinson had talked to her over the telephone, and he had stated repeatedly that he had the same opinion of her injury as had Mr. Hill, and that he had talked with her doctor, and the doctor had told him that her trouble was due to other conditions; that the injury did not cause the trouble she was having in her back.

On January 10th, she agreed with Mr. Hill, over the telephone, to settle her case for $225. Plaintiff then was asked if, at the time she consented to settle for $225, she believed that her doctor had told the railroad representatives what they said about her pain coming from other conditions, and she replied that she relied upon their statements.

Plaintiff saw Mr. Wilkinson at the Government Hotels on the 11th of January, 1924, about 5 o'clock in the afternoon. He asked her how she felt, and she told him that she was feeling very badly and was getting much worse. He replied, "I have something here that will make you feel better," and showed her a check. She replied, "I can't accept that; I am getting worse all the time, and it isn't a fair settlement for my injuries." Mr. Wilkinson replied, "Well, I have just had a long talk with your doctor, and he said that your condition is not due to this injury, but to the other conditions; you haven't any witnesses either; you can't get anything on that account."

Plaintiff testified that she relied on what he told her as to what her doctor told him, and said that she would not have accepted the check in settlement, had she known that her doctor did not tell him that, or had she

known her real condition; that he talked so much about the other conditions, and that she at the time was sick. Mr. Wilkinson handed her some papers and she signed them. No one else was with her at the time. Mr. Wilkinson did not read the papers to her, and during the conversation she told him that she could not sign, because she was getting worse all the time, and that he said, "You know your trouble is due to other conditions; I just had a long talk with your doctor, and he said your trouble is caused by those other conditions, and not the injury; your injury is very trifling; in fact, I was surprised Mr. Hill would allow you that much, because your injury was not worth it, because it was very slight, and I doubt, if you don't take it, whether Mr. Hill will ever offer it to you again, since the injury is so slight and the offer was just out of generosity."

Plaintiff testified that Mr. Wilkinson also said that he hoped "I would get better, but it was very doubtful; that frightened me, because I was feeling so bad anyhow, and then he said that he had just buried his sister-in-law with the same condition I had, and these other conditions that my doctor had told him about was the cause of my trouble, instead of the injury." Mr. Wilkinson denied mentioning the sickness and death of his sister-in-law, but it is hardly satisfactorily explained how Miss Sneed knew of his sister-in-law's condition and death. There is no claim that she had any acquaintance with her, or had ever seen her.

Plaintiff testified that she did not cash the check given her by Mr. Wilkinson; that she did not think it was a just settlement, and she felt that way so much that she never cashed the check.

Mr. Hood, who testified on behalf of the defendant, was plaintiff's immediate superior in her position with the Interstate Commerce Commission, and it is shown in the evidence that he was consulted by her at different times before her settlement, and that he advised her that, if she was not hurt, it looked like a gift, but that, if she had not made up her mind if she was hurt, that she ought not to settle, and that she replied, "Well, I'm afraid if I put him off I will not get the $300." He advised her not to get a lawyer, on account of the cost, and stated that if she needed a lawyer, he would get one from the department.

Prior to February 1, 1924, plaintiff wrote to Dr. Finney, of Johns Hopkins Hospital in Baltimore, Md., about her case, and on February 1 received a letter from him, recommending Dr. Leadbetter, a specialist in orthopedic surgery. She called on Dr. Leadbetter on February 2d. She did not tell him that her pain came from a tumor, but told him about the pain in her back, and that she had been injured on a street car. Dr. Leadbetter gave her about the same treatment that had been given her by Dr. Crowley, except that he also gave her a brace to wear. He told her that her injury and suffering were due solely to the accident.

Her trip to Baltimore, to see Dr. Kelley, who removed the tumor, was made in February, 1924. She went on the steam railroad, and no one accompanied her. Her other trips to Johns Hopkins Hospital were made in the same manner. She told Dr. Kelley of the pain in her back; that she had been operated on in Kansas City in 1915 for a tumor, and that she had had another pelvic operation in 1921, and that she was afraid that this growth on the urethra was a return of the tumor. She also complained to Dr. Kelley of a spinal injury, which Dr. Kelley said she claimed she had received "16 months before that date. Plaintiff denied saying 16 months."

In March, 1924, plaintiff went to Johns Hopkins Hospital for an examination of her back. There she explained that she had been hurt in a street car accident. According to the hospital records, her injuries showed a "tenderness from the fourth and sixth dorsal spines and lumbar vertebræ, especially on right back. Pain referred to this part in flexing body. All movements of spine limited. * * * Slight infectious arthritis. No evidence of any fracture." The further diagnosis of the injury was that it was nothing of an organic nature, that the condition was a functional affair, and that the "impression" of her difficulties was that she was suffering from neurosis.

Plaintiff had an abnormal spine. She had six lumbar vertebræ, instead of five, and this abnormality weakened her back and made it more susceptible to a sprain than if her spine had been normal. Her condition seemed to grow worse in the spring of 1924, and seemed to reach an acute stage in May and June. In 1925 Dr. William Mason, of Washington, at the suggestion of Dr. Leadbetter, removed her tonsils.

The settlement was made on January 11, 1924. The release was in the usual form. No further notice came to the defendant that she was dissatisfied or renounced the agreement until on January 7, 1925, her attorney wrote a letter to the defendant company to the effect that he had been consulted by plain-

tiff and that the release had been obtained by misrepresentation; that she had not cashed the check, and that she had delivered it to him, to be tendered to the defendant; that her injury appeared to be permanent, that she had been unable to work since the accident, that she desired compensation, and that the letter was written in order that he might confer with defendant's representative, for the purpose of arranging an amicable adjustment if desired.

Plaintiff grew continually worse. It is conceded, we think, in this case, that plaintiff's injuries are genuine. Defendant's own medical experts testified that she was not malingering, and that she was suffering from neurosis, which is frequently a very painful disease.

The testimony shows that there was a sacro-iliac sprain, and that this probably caused arthritis, or inflammation of the joints of the spine, and that the sacro-iliac sprain and the resulting spinal trouble was caused by the injury; that she has had constant treatment since her settlement, and has not been able to work any, and that her condition was continually growing worse; at the time of the trial she could not walk or sit up much, on account of the pain in her back and her head and her limbs, and that her suffering was quite intense; that, if she sat up any length of time, she could not sleep afterwards; that she is required to sleep on what is called a fracture bed, which is composed of boards being put under the mattress. She was on a bed or couch during the trial and during the taking of her testimony. At the time of her injury she was receiving compensation from the government in the sum of $1,320 per year and $240 bonus.

The record is silent as to the particular date or time when she was informed or learned of the untruthfulness of the representations made by the claim agent. The defendant argues that, from her conduct, she must be held to have known of the untruthfulness of the statements long before her attorney renounced the release, and that her delay in revoking the contract makes it valid and binding. The plaintiff concedes that there is no definite date fixed when plaintiff became convinced or was informed of the untruthfulness of the representations, but contends that, as soon as she did become so convinced, she consulted a lawyer and repudiated the release.

To plaintiff's declaration defendant filed its three separate pleas—the first denying all the allegations in the declaration, except the formal ones; the second plea pleads the release; and the third plea was in the nature of accord and satisfaction, in which was set up the payment of the money.

At the time of trial the defendant filed an amended rejoinder, and there pleaded plaintiff's ratification of the release by her conduct. The plaintiff, in the meantime, had filed her joinder and replications, in which she pleaded fraud in procuring the release. At the close of plaintiff's testimony the defendant moved the court to direct a verdict for the defendant, on the grounds:

(1) That the evidence established facts which clearly imposed a duty upon plaintiff to make inquiry for the purpose of ascertaining the truth or falsity of the misrepresentations, and that her failure to inquire charged her with knowledge of all facts that a reasonable investigation would have disclosed.

(2) That she, being a woman in full possession of all of her faculties during the negotiations of the settlement, was dealing at arm's length and had no right to rely upon any representations with respect to her physical condition and with respect to what plaintiff's doctor had said.

(3) That by plaintiff's conduct she has ratified the release.

(4) That the misrepresentation was not the inducing cause for the execution of the release.

(5) A variance between the allegations and the proof.

(6) No evidence showing any instrumentality or employee of the defendant caused the injuries.

The court refused to grant the motion, and, under instructions, gave the case to the jury. In this court the defendant has assigned 15 errors; the first one being failure to direct a verdict for the defendant. Assignments 2 to 14, inclusive, are predicated upon the court's refusal to give certain instructions. Assignment 15 is the refusal of the court to grant defendant's motion for a new trial.

We have carefully looked into the assignments of error from 2 to 14, inclusive, and we think that the case was submitted to the jury with full and fair instructions as to the law, and that the instructions given were quite friendly to defendant's contentions. In the particulars suggested by defendant's counsel, we think that the court's instructions and the court's refusal to give instructions, requested by defendant, are not justly subject to the criticisms presented in defendant's brief and assignment of errors. Some of the con-

tentions of defendant as to certain instructions, refused, are probably fully answered in our discussion of the first assignment. We see no reversible error in connection with the assignments from 2 to 14, inclusive. This view is supported by many authorities, among them being Davis v. Coblens, 12 App. D. C. 51, District of Columbia v. Wilcox, 4 App. D. C. 90, and Presbrey v. Thomas, 1 App. D. C. 171.

[1] The fifteenth assignment of error, having reference to the overruling of a motion for a new trial, in view of the views hereinafter expressed, is without merit, since such refusal must amount to an abuse of discretion before it is available as an assignment of error, and it was no abuse of discretion in the instant case to overrule the motion. Woods v. Richmond & Danville Railroad Co., 1 App. D. C. 165.

The interesting questions so ably presented by the learned counsel on both sides of the case can and will be decided and discussed by us fully under the first assignment of error, which is predicated upon the court's refusal to direct a verdict for the defendant. Under the first assignment of error, it is contended by defendant's learned counsel:

First. That the court erred in submitting the case to the jury, when, as a matter of law, he should have held, by sustaining the motion to direct a verdict, that the plaintiff was chargeable with knowledge of the untruthfulness of the representations made to her by the claim agent, since it was her duty to make inquiry, if it was reasonably possible for her to do so, and if such inquiry was reasonably calculated to have disclosed the fraud. We assume that by this is meant that plaintiff, before signing the release and after being told of the doctor's statement, should have made such inquiry.

Second. That the facts before the court at the time of making the motion for a directed verdict disclosed that plaintiff knew she was dealing at "arm's length" and that she, as a matter of law, had no right to rely upon the misrepresentation.

Third. That plaintiff, by her conduct subsequent to the signing of the release, ratified the same.

[2] Admitting the correctness of the abstract statements of law to which defendant adverts in connection with its first assignment, when applied to a certain state of facts, we think that, under the circumstances of this case, the trial court properly submitted these questions, under proper instructions, for the consideration of the jury. The first two reasons will be treated herein in connection with the discussion of the third reason.

The third reason assigned for a directed verdict, to wit, the ratification of the release, is the most meritorious reason assigned, and its importance to the decision of this case entitles it to the close consideration of this court. It is in no sense an easy question to decide, and is not decided without a full realization that the contention of the able counsel of appellant may be supported by considerable very respectable authority, and especially is this true, if the facts in the case are interpreted to be as presented by appellant's brief. Appellant proceeds upon the theory that plaintiff discovered the fraud perpetrated upon her soon after the signing of the release, or perhaps it is inferred that at the time she signed the release she was conscious of the fact that she was being defrauded.

[3] Unquestionably the testimony warranted the trial court in submitting the question to the jury as to whether she was or was not, in fact, induced to sign the release by fraudulent representations. 2 Black's Rescission and Cancellation, p. 976, § 391. Her failure to cash the check cannot be said, as a matter of law, to conclusively show that, when she first decided not to cash it, she had then learned of the fraud. It might be regarded by the jury as some evidence that she had learned of the fraud, or was becoming convinced of the fact that she might have been defrauded. We think the chief value of the evidence that she did not cash the check lies in the weight that the jury might attach to it as bearing upon the question as to whether or not her conduct was a ratification of the contract. True enough, she stated when she signed the release that she did not believe it was a fair settlement; but her testimony is positive, and there is nothing to dispute it, that she signed it because of and relying upon the false representations of the claim agent that her doctor had just told him that her disabilities did not come from the injury, but from her other ailments, and that she had no witnesses. Just when she learned that she did have witnesses, including her doctor, Crowley, and that he had not told the claim agent that her disabilities were not of accident origin, the testimony at no place discloses. It was natural for her, in seeking recovery, to visit other doctors and tell them of her accident, even though she still believed that Dr. Crowley had said that her injuries had nothing to do with the pain in her back.

It must be recalled that she did not see a lawyer for many months after the injury, and in the meantime, according to the undisputed testimony, her condition was gradually getting worse. She had not worked, and could not work. Her tumor had been removed by a slight and unimportant operation, and it was natural for her to finally become convinced that the representations made by the claim agent were probably false. The natural inference from the facts is that, when she became so convinced, regardless of the source of her information, she sought to repudiate the agreement.

[4] If, immediately after signing the release, she had been told definitely by Dr. Crowley that her ailment was the result of the accident, and that he did not state the contrary to the claim agent, and then she had waited for nearly a year, we would have another question before us. Her condition in the interim, if that of a person suffering with acute neurosis, must also be taken into consideration. Wilson v. San Francisco-Oakland Ry., 48 Cal. App. 343, 191 P. 975. That one seeking to repudiate a release, such as in this case, on the grounds of fraud, upon discovering the fraud, must act promptly, or else will be deemed to have ratified it, is a correct statement of the law, needing no citation to support it.

[5] We do not believe the trial court would have been justified in concluding, as a matter of law, from the facts in this case, that plaintiff was guilty of laches or undue delay in renouncing the agreement after the discovery of the fraud. We think that it was properly left to the jury to apply the facts, and determine the probable time of her becoming cognizant of the fraud, and the reasonableness of her conduct after having so discovered it. Smith v. Rhode Island Ry. Co., 39 R. I. 146, 98 A. 1; Platt v. American Cement Plaster Co., 169 Iowa, 330, 151 N. W. 403; Quapaw Mining Co. v. Cogburn, 78 Okl. 227, 190 P. 416; Bachman v. Travelers' Insurance Co., 78 N. H. 100, 97 A. 223; Brainard v. Van Dyke, 71 Vt. 359, 45 A. 758; Andrews v. Hensler, 6 Wall. 254, 18 L. Ed. 737; Wilson v. San Francisco-Oakland Ry., 48 Cal. App. 343, 191 P. 975; Owens v. Norwood-White Coal Co., 188 Iowa, 1092, 174 N. W. 851.

There are many authorities which hold (and these authorities chiefly relate to contractual matters, other than releases in personal injury cases) that one to whom false representations are made in order to induce him to sign an agreement has no right to re-

ly upon such representations, if their untruthfulness is obvious, or if the untruthful statements consist only of an expression of an opinion with which both parties are equally familiar, or where, by reasonable inquiry, such as would be indulged in by an ordinarily prudent person under the same circumstances, the falsity of such representations could have been readily discovered by the aggrieved party before the execution of the contract. On the latter proposition there is considerable good authority to the contrary, however. See Bachman v. Travelers' Insurance Co., supra.

We think the foregoing principles of law are settled, and in a proper case apply to a contract of release from damage for personal injury. Accepting them as the law, let us apply them to the case at hand. Here was a woman who, without legal advice, sought to settle her difficulties, and who, according to her testimony, was at the time suffering from her injury, and who had been frequently told by the claim agent that her pain was not due to her injury, and who was also told that her own doctor had so stated. In the final conversation, let it be remembered that she told him she was feeling very badly, and that she was getting much worse, and that the defendant's representative replied, "I have something here that will make you feel better." She said, "I cannot accept that; I am getting worse all the time, and it isn't a fair settlement for my injuries." That Mr. Wilkinson said, "I just had a long talk with your doctor, and he said your trouble is not due to the injury, but to other conditions; you haven't any witnesses either; you can't get anything on that account; your injury is very trifling." Quoting plaintiff's testimony further, "in fact, he said he was surprised Mr. Hill would allow me that much, because my injury wasn't worth it, because it was very slight, and he doubted, if I didn't take it, whether Mr. Hill would ever offer it to me again," and that he said to her then that the offer was out of generosity; that he (Wilkinson) hoped that she would get better, but that it was very doubtful; and that then he said to the already frightened woman that he had just buried his sister-in-law with the same trouble—that is, the conditions that her doctor had told him she had. She stated that he spoke crossly and angrily to her.

Wilkinson himself testified that, at about 5 o'clock in the afternoon of the day when the release was executed, he saw plaintiff at

the Government Hotels, and that he handed her the release and that they sat down at a table; that plaintiff took the release and read it, and picked it up and looked at it, and laid it on the table, and repeated that three or four times, looking at it and reading it; that she said, "I don't think I ought to sign that;" that she wanted the check, but that he could not let her have the check unless he got the release and the receipt; that she would not decide what to do; that he had another engagement at 6 o'clock, and got tired sitting there waiting for her, and finally he picked up the release and folded it up in his papers, which he carried, and said, "Miss Sneed, if you change your mind about that, let me know, and I will come down again;" and that Miss Sneed said she ought to have more, she wanted more, and he told her that she had made the agreement with Mr. Hill, and that he thought it was a fair settlement; that she said she ought to have more; she kept saying she ought to have more; that after he started to leave she said, "Wait a minute, Mr. Wilkinson, let me see that paper again;" that he handed it to her, and she laid it on the table and said, "Here's what I don't like; if I sign this, it says I forever release the Capital Traction Company; I could have no chance to come back and get more money;" and that he said: "No, Miss Sneed; this is a final settlement, and you want to understand it that way;" that she thought for a while longer and said, "Well, I'll sign it," and she signed it, and he handed her the check and left.

If we correctly understand appellant's position, it is its contention that, after hearing the misrepresentations made by Wilkinson, plaintiff should have gone to the telephone and called up her doctor, before signing and delivering the release. We do not think that, *as a matter of law*, this duty is imposed upon the plaintiff, under the circumstances. Smith v. Rhode Island Ry. Co., supra. See 26 Corpus Juris, 1147, and cited cases. Her pain, her experience and lack of experience, her necessities, the claim agent starting to leave the room and representing that she would probably never have another chance, were all facts that properly went to the jury in determining whether or not she could have reasonably ascertained the falsity of the statement before signing and whether she should have done so. In a commercial transaction, where the parties meet on equal terms and the facts represented are equally obvious to both, a different situation exists.

As a matter of law, should the court say that it was the duty of the plaintiff, under the circumstances, especially when the claim agent was telling her that she would probably not have another chance to settle, and that he was in a hurry, to seek an interview with a doctor whom she believed had mistreated her, by either falsifying to her or to the claim agent in the matter of such vital concern? We think not.

Under the circumstances of this case, we think that whether or not she had reasonable opportunity to discover the fraud before execution of the release, and whether or not she acted with due diligence in renouncing the agreement after discovering the fraud, are both questions that properly went to the jury, under the instructions of the trial court, and that the court properly overruled the motion for a directed verdict.

Appellant relies upon United States Trust Co. v. David, 36 App. D. C. 549, in which Mr. Justice Robb, in delivering the opinion of the court, called attention to the following rule:

"It had actual notice that both companies were insolvent, and that their relations would necessarily be involved, to some extent at least, in the equity cause. We think these facts clearly bring the case within the rule that 'whatever is notice enough to excite attention and put the party on his guard and call for inquiry is notice of everything to which such inquiry might have led. When a person has sufficient information to lead him to a fact, he shall be deemed conversant of it.' Wood v. Carpenter, 101 U. S. 135, 25 L. Ed. 807."

The rule in that case was correctly quoted and correctly applied, but does not fit the facts at hand. What was there in the instant case which, under the circumstances, would be reasonably calculated to lead the plaintiff to believe that her doctor had not "just" stated to the claim agent that her pain was not caused by the accident? She testified positively that she relied upon his representations and believed them, and we can readily understand how she might have concluded that the doctor had, for sufficient reasons, in his conversation with her, withheld from her the real cause of her suffering. That she did believe the statement is corroborated by the fact that, in her subsequent conversation with Dr. Kelley at Baltimore, she expressed the fear that the growth on the urethra was a return of the tumor. The fact that she had a tumor, and that Dr. Crowley had notified her of that fact, would naturally strengthen

her belief in the claim agent's representations.

The questions as to whether the defendant obtained the release by fraud and whether plaintiff ratified the same were, by the court, submitted to the jury. The jury, by its verdict found that the release had been so obtained and had not been ratified. The trial court, who saw the witnesses and heard the testimony, refused to hold, as a matter of law, that the release was valid, or had been ratified, and refused to grant a new trial upon defendant's claim that the jury had found contrary to the evidence. We are now asked to reverse the action of the trial court and set aside the findings of the jury, by declaring that the involved statement of facts, which are somewhat contradictory in character, as a matter of law shows that the release was valid or that the same had been ratified. This we cannot do.

The rule that one who seeks to avoid the effects of a contract obtained by fraud must act with reasonable diligence upon ascertaining the existence of the fraud is a wholesome rule, designed to prevent very grave injustice being done on account of the changed relations of the parties after the execution of the instrument. The property received by the defrauded party might greatly depreciate in value. (The check in the instant case did not change in value.) If unreasonable delays, under such circumstances, were permitted, it might result in frauds far more damaging in character than the initial one. The courts do not countenance the perpetration of one fraud to counteract the result of another, but a careful examination of all cited authorities does not disclose that the courts ever applied the doctrine of ratification by delay to a fraudulently procured release, upon facts from which different reasonable conclusions could be drawn, and where its application rendered a manifest and irreparable injustice. A contract which obtains for $225 a consideration worth $18,000 under ordinary circumstances is enforceable, but the courts will not indulge in the niceties and refinements of the law in order to uphold such a contract, where it was obtained by fraud.

The judgment of the court below is affirmed, with costs and interest.

Judgment affirmed.

ROBB, Associate Justice, dissents.