## QUAPAW MINING CO. v. COGBURN.

No. 9625—Opinion Filed May 11, 1920.

(Syllabus by the Court.)

**1. Release — Fraudulent Procurement—Necessity for Decree of Rescission Before Suit for Personal Injuries.**

Where personal injuries have been suffered, for which a liability exists, and a release therefor has been fraudulently procured for a grossly inadequate sum, an action for damages may be maintained without first obtaining a decree to rescind or to cancel the release.

**2. Same—Fraud Justifying Rescission of Release—Physician's Opinions.**

Where the professional opinion relied on is not given directly by the physician to the patient, but is communicated to him by a third person, it is the duty of the latter to repeat it with entire correctness. And where the person responsible for the injury, or the agent, falsely represents to the releasor what a physician or surgeon thinks or has said about his injuries, it is a fraud which will justify the rescinding of a release executed in reliance on such false statements.

**3. Same.**

Where the plaintiff in a personal injury case is induced to execute a release of damages by the false and fraudulent representations of a physician in the employment of the defendant, or sent to him by the defendant, that his injuries are but slight or temporary, the physician well knowing the contrary, the release will not be binding.

**4. Trial—Province of Jury—Credibility of Witnesses.**

The credibility of witnesses is a matter lying peculiarly within the province of the jury.

**5. Release—Rescission—Sufficiency of Evidence.**

Evidence examined, and held sufficient to support the finding of the jury voiding the release of damages signed by the plaintiff.

**6. Master and Servant—Mines and Minerals —Statutory Duties of Operators—Lead and Zinc Mines.**

Sections 3983 and 3984, Revised Laws 1910, prescribing certain duties of mine operators toward employes, including the duty of daily inspection, applies to the operators of lead and zinc as well as coal mines.

**7. Same—Violation of Duties—Negligence— Liability.**

The violation of the duty expressly imposed by a statute upon the owner or operator of a mine to his employes or to the public is negligence which prima facie imposes liability for damages resulting therefrom.

**8. Same—Basis of Liability—Injuries to Employe.**

Where an employe at work in a mine is injured by the falling of a loose rock, the employer's liability depends not upon whether it had actual or constructive notice that the rock was loose, but upon whether it had failed to perform its statutory duty to secure loose rock from falling.

**9. Same—Action for Injuries—Judgment— Evidence—Instructions.**

After a careful examination of the entire record it is held: (1) that the evidence reasonably supports the verdict and judgment in favor of the plaintiff; (2) that the errors complained of, based upon the rejection of evidence and the giving or refusing to give instructions, have not resulted in a miscarriage of justice.

Error from District Court, Oklahoma County; Edward Dewes Oldfield, Judge.

Action for personal injuries by Charles Cogburn against the Quapaw Mining Company. Judgment for plaintiff, and defendant brings error. Affirmed.

A. Scott Thompson, G. W. Earnshaw, and Asp, Snyder, Owen & Lybrand, for plaintiff in error.

J. M. Grubbs, for defendant in error.

KANE, J. This was an action for damages for personal injuries, commenced by the defendant in error, plaintiff below, against the plaintiff in error, defendant below. Hereafter, for convenience, the parties will be called "plaintiff" and "defendant," respectively, as they appeared in the trial court.

The plaintiff was employed by the defendant as a shoveler in its lead and zinc mine, and was severely injured by falling rock from the roof or side of the drift in which he was working. The plaintiff alleged in his petition that the defendant was negligent in failing to properly inspect the mine and in failing to provide timbers in the mine to prevent the rock, which caused the injuries, from falling, as required by sections 3983, 3984, 3988, and 4014, Revised Laws 1910.

The answer sets up a general denial, contributory negligence, assumption of risk, and a settlement. The reply denied the allegations of new matter in the answer and alleged that the settlement was procured by fraud.

Upon trial to the jury there was a verdict for the plaintiff in the sum of $9,650, to reverse which this proceeding in error was commenced.

While counsel for the defendant have assigned numerous errors, they have summarized them all in their brief under four subheads, which, for convenience, we re-arrange as follows:

(1) The plaintiff was precluded by his settlement from recovering.

(2) The evidence was not sufficient to authorize a verdict and judgment for the plaintiff.

(3) Errors in the rejection of evidence offered by the defendant.

(4) Error in the instructions.

By the settlement set up in the answer, which was procured by the defendant's claim agent some three weeks after his injury, the plaintiff, for the sole consideration of $2,000, released and discharged the defendant from all claims, demands, damages, actions, or causes of action on account of the injuries. The injuries inflicted upon the plaintiff consisted of numerous wounds upon his back, head, breast, and left arm, the injury to his back being of such a nature that it cut off all motor sensibility of his lower limbs, thus causing permanent paralysis from the waist downward. The fraud relied upon to avoid the settlement consisted of alleged false and misleading statements made to the plaintiff concerning his condition by the defendant's claim agent and by the defendant's physician while the plaintiff was under their care. The plaintiff seems to have been in an unconscious or dazed condition for several days after his injury, and the settlement was consummated after some five or six visits of the claim agent, the negotiations commencing a few days after the plaintiff had regained consciousness and continuing until the agreement was finally reached.

It is well settled in this jurisdiction that where personal injuries have been suffered, for which a liability exists, and a release therefor has been fraudulently procured for a grossly inadequate sum, an action for damages may be maintained without first obtaining a decree to rescind or to cancel the release. St. L. & S. F. R. Co. v. Richards, 23 Okla. 256; St. L. & S. F. R. Co. v. Nichols, 39 Okla 522; St. L. & S. F. R. Co. v. Reed, 37 Okla. 350; Enid Electric & Gas Co. v. Decker, 36 Okla. 367; C., R. I. & P. R. Co. v. Burke, 73 Oklahoma, 175 Pac. 547; C., R. I. & P. R. Co. v. Johnson, 71 Oklahoma, 175 Pac. 494.

The plaintiff testified that the claim agent frequently told him that he was not badly injured, that he would be all right and back at work again in a short time; that the claim agent based these assertions upon alleged conversations with the doctors to the effect that the plaintiff was not seriously hurt, and that he would fully recover in due time. The plaintiff also testified that the company doctor at Commerce, the home of the plaintiff, and Dr. Gregg, in the hospital at Joplin, where the plaintiff was sent for treatment by the advice of the local physician, also advised him to the same effect. The plaintiff further testified that he was ignorant of his true condition, and that the settlement was entered into in reliance on these statements. The claim agent and the doctors each flatly denied the statements attributed to him, and testified that on the contrary he acted in the utmost good faith toward the plaintiff. Both of the doctors admitted that the plaintiff's condition did not warrant the statements ascribed to them. Dr.

Wormington, who attended the plaintiff in his home at Commerce, testified that he knew the injuries to the plaintiff's back had caused paralysis, and that if the injured nerve was not relieved by nature or by an operation the injury would be permanent, and that it was in hope of relieving this condition by an operation that he sent the plaintiff to the Joplin hospital for an examination by Dr. Gregg.

Dr. Gregg testified, in substance, as follows:

"I told him he was bruised over the site of the injury; that the cord had probably been severed, or was so restricted that it cut off all motor sensibility of the lower limbs. I did not give him any encouragement, and I did not think from the line of talk that they thought any more of it. I did not think he would survive the anaesthetic. I thought the anaesthetic would probably kill him, and that the injury was so extensive that I did not see any consequence in removing the pressure off the cord, as I thought the cord had been sufficiently injured that it was destroyed."

Both doctors testified that they communicated the result of their investigation and their honest opinion as to his condition to the plaintiff, and that they never advised the claim agent to the contrary.

This evidence, it seems to us, joins a sharp issue of fact upon which the finding of the jury in favor of the plaintiff justifies the judgment entered thereon, upon two grounds.

Black in his Rescission and Cancellation of Contracts, sec. 390, lays down the following rule.

"Where the professional opinion relied on is not given directly by the physician to the patient, but is communicated to him by a third person, it is the duty of the latter to repeat it with entire correctness. And where the person responsible for the injury, or the agent, falsely represents to the releasor what a physician or surgeon thinks or has said about his injuries, it is a fraud which will justify the rescinding of a release executed in reliance on such false statement."

The same author in the same section is authority for the following rule:

"Where the plaintiff in a personal injury case is induced to execute a release of damages by the false and fraudulent representations of a physician in the employment of the defendant, or sent to him by the defendant, that his injuries are but slight or temporary, the physician well knowing the contrary, the release will not be binding, especially where the plaintiff was ignorant of such matters or was, at the time, too weak and

ill to form an intelligent judgment for himself."

The finding of the jury on this sharply conflicting testimony entitled the plaintiff to recover under either or both of these two rules.

The evidence of the plaintiff was direct and positive to the effect that the claim agent of the defendant falsely represented what the physicians or surgeons thought or said about his injuries, and also that the physicians and surgeons of the defendant falsely advised him as to his condition. At first blush it may appear that the great weight of the evidence is against the plaintiff on this point, but when we reflect that no one was present, except the particular parties engaged therein, during any of the conversations held between the plaintiff and the claim agent and between the plaintiff and each of the doctors, the evidence stands pretty well balanced as to the number of witnesses testifying to each conversation. In these circumstances, the verdict turning upon the credibility of the witnesses, a matter lying peculiarly within the province of the jury (11 A. & E. Enc. 498), we do not feel justified in reversing the finding of the jury, who saw the witnesses upon the stand, observed their demeanor, their candor or lack of candor, and all the other circumstances which may be determining factors in cases like this, where the evidence is so sharply conflicting.

As was said by this court after reviewing the evidence in the case of Enid Electric & Gas Company v. Decker, supra:

"The jury had this as well as other testimony and circumstances before it, and under this testimony and the surrounding circumstances we do not feel justified in saying that such evidence did not reasonably tend to support their finding."

There is some discussion in the brief of counsel for the defendant as to the mental capacity of the plaintiff to enter into a contract of settlement, but, in view of the statement of counsel for the plaintiff in his brief that it is not contended that the plaintiff was unconscious or crazy or anything like that, at the time he made the settlement, and that it is not because of his mental condition that the plaintiff claims the release should be set aside, we do not deem it necessary specifically to notice this phase of the question.

Preliminary to the next question presented for review, it is conceded by the parties that the measure of responsibility due from the master to his servant is correctly stated in C.,

R. I. & P. R. Co. v. Duran, 38 Okla. 719, 134 Pac. 876—that is, the master must furnish to the servant a reasonably safe place to work and reasonably safe tools with which to work; and that to constitute actionable negligence, where the wrong is not willful and intentional, three essential elements are necessary: (1) the existence of a duty on the part of the defendant to protect the plaintiff from injury; (2) failure of the defendant to perform that duty; and (3) injury to the plaintiff resulting from such failure.

Starting from this agreed premise, we will now examine the sufficiency of the evidence to authorize the verdict and judgment for the plaintiff upon the merits.

The evidence shows that the drift where the plaintiff was working at the time of his injury was 18 or 20 feet wide and ten or twelve feet high and had a mixed formation of soapstone and hard rock.

The plaintiff testified as follows:

"Q. Describe this soapstone so the jury will understand what it is? A. It is something like a slate rock, soft and slacks up, when it gets to the air, it slacks to pieces, it slacks up like lime, it is a soft rock. Q. Did any pieces ever fall in the mine when you were in there? A. Yes, sir. Q. What kind of pieces were they? A. Well, at one time there was a large piece fell just at the turn of this drift and the one on the right, and several different times small pieces of the soapstone fell, most any time during the day there were some falling little slivers. Q. Were there any props or timbers in this mine to prevent the falling of stone? A. No, sir; there was not. Q. Were there any in this drift where you were working? A. There wasn't any in the mine at all."

Another witness, an experienced miner, after testifying to the same effect as to the formation of the drift, testified as follows:

"Q. Now, assuming that a drift was of soapstone formation and was 20 feet high, 25 to 35 feet wide, state what, if anything, could be done to make it more safe than just to leave it without any timber? A. Well, I don't know that anything could be better than to timber it. Q. In what way would the timbers make it more safe? A. Hold up the soapstone, wouldn't it?"

Another witness, who was also an experienced miner, testified as follows:

"Q. Now, where did the rocks fall from that fell on Cogburn? A. Well, fell from the roof and from the side, both. Big slab from the roof, I think, that is the one that hit him. Q. How was this slab located at the time you found Cogburn? A. Broke all around him. Big rock as big as this table, I guess (indicating a double office desk in room), lying kind of over him, and a few small pieces broke up and laying right beside and around him. Q. What, if anything, held this big rock from crushing him down towards the ground? A. The can, I think, is what held that big rock off of him. Q. Did you observe the stone that had fallen there in the mine at that time, as to what it was, what kind of stone? A. Do I know what kind it was? Q. Yes. A. There fell soapstone. Q. What is the nature of soapstone; what is its characteristics, whether it is strong, or otherwise? A. Kind of slick, blue, white looking rock. It isn't solid. Q. Wasn't solid? A. No; slick. Q. What about its being strong, as holding in place, will it or will it not hold itself in place? A. When it is arched up it will hold. When it is just a flat place it will fall. Q. What do you mean by being 'arched up'? A. That is where it kind of come up to an arch, like this (indicating). Q. Was this arched or flat? A. Flat. Q. Do you know whether or not anything could have been done to protect this falling of rock in this mine? A. Yes, sir; there could have been timbers put up there and protected it. Q. In what way would timbers have protected it, Mr. Slayton? A. If there had been big timber up there, the soapstone wouldn't have fell; would have protected it, held it up; kept it from falling down."

There was other evidence to the same effect, tending to show that, on account of the soapstone formation, the drift was an unsafe place to work, and that timbering was necessary in order to make the drift safe.

In Big Jack Mining Company v. Parkinson, 41 Okla. 125, it was held that sections 3983 and 3984, Revised Laws 1910, prescribing certain duties of mine operators toward employes, including the duty of daily inspection, applies to the operators of lead and zinc as well as coal mines.

Section 3983 of the chapter on Mines and Mining requires every operator to employ a competent and practical inside overseer for each mine employing ten or more persons inside, who shall have charge of the inside operations of the mine and shall see that the provisions of this chapter are strictly enforced. This section provides that the foreman shall keep a careful watch over timbering, etc., and see that sufficient props, caps, and timbers of suitable size are sent into the mine when required, and that he shall as far as possible see that as the miners advance their excavations all dangerous slate and rock overhead are taken down or carefully secured against falling.

Section 3984 provides that the foreman shall see that all miners are supplied at all

times with such timbers, props and cap pieces as are necessary to keep their working places in a safe condition, and that all such timbers, props, and cap pieces shall be delivered at the face of the miners' working place, and if from any cause the timbers cannot be supplied where required, the said mine foreman shall instruct the persons to vacate all said working places until supplied with the timber needed.

Section 3986 provides that the mine foreman shall direct that each and every working place shall be properly secured by props or timbers, and that no person shall be directed or permitted to work in any unsafe place unless it be for the purpose of making it safe.

Section 4014 declares that any violation of this chapter shall be a misdemeanor.

Counsel for defendant concede that the drift where the plaintiff was injured was not timbered, but they say that the uncontradicted evidence shows that no timbering that could have been placed in the drift would or could have prevented the injury. They contend that in these circumstances, there being nothing to refute this evidence except the bare fact that the plaintiff was injured, the case is governed by the rule laid down in C., R. I. & P. R. Co. v. Brazzell, 40 Okla. 460, wherein it was held that the fact of an accident or injury to the employe as a rule carries with it no presumption of negligence on the part of the employer; and by the rule laid down in St. L. & S. F. R. Co. v. Hess, 34 Okla. 615, to the effect that in a suit for damages for personal injuries, although the defendant may be shown to have been negligent in some manner, yet, unless the negligence so shown was the proximate cause of the injury complained of, no recovery can be had on account of such negligence. We are unable to agree with counsel in this contention. There can be no doubt that the evidence conclusively shows that timbers, props, and cap pieces were not furnished by delivering the same at the face of the miner's working place in the mine as required by the statute.

The foreman conceded that the drift was not timbered, but he said that timbers were available for that purpose and that he could have procured them whenever timbering was necessary to make the mine safe. Possibly timbers were available on the surface of the ground near the mine, but the evidence does not disclose that timbers were even this near; nor just where they were. This, in our opinion, does not meet the requirement of the statute, which provides that props, caps, and

timbers of suitable size be sent into the mine, cut to suit the places where they are to be used, delivered to the working force by company men, and that there shall be sufficient timbers, props, and cap pieces to keep the miners' working place safe, etc., delivered at the face of the miners' working place. The operator must not only furnish timbers and a timber man to timber the mine, but he must see that the mine is actually timbered. Great Western Coal & Coke Co. v. Coffman, 43 Okla. 404, 143 Pac. 30; Great Western Coal & Coke Co. v. Cunningham, 43 Okla. 417, 143 Pac. 27; Great Western Coal & Coke Co. v. Belcher, 43 Okla. 439, 143 Pac. 36; San Bois Coal Co. v. Resetz, 43 Okla. 384, 143 Pac. 46; McAlester Edwards Coal Co. v. Hoffar, 66 Oklahoma, 166 Pac. 740.

As these statutes require the operator to timber the mine for the purpose of protecting the miners against injuries resulting from falling rock, it seems quite obvious to us that when failure to timber followed by injury by falling rock is shown, the only question left for consideration is whether the injury was caused by failure to timber, which is purely a question for the jury to determine from the facts and circumstances of each particular case.

The sections of the mining laws hereinbefore cited require the operator to appoint a foreman, whose duty it is to keep a careful watch to see that as the miners advance their excavations all loose slate and rock are carefully secured against falling.

In these circumstances, the employer is chargeable with knowledge of whatever it is his duty to find out and know. 5 Thom. Com. L. of Neg., sec. 5404. In Madison v. Clippinger 74 Kan. 700, 703, 88 Pac. 260, 261, it was said:

"That the violation of a duty expressly imposed by a statute upon an owner or operator of machinery dangerous to employes or to the public is negligence which prima facie imposes liability for damages resulting therefrom, is well settled law."

The defendant, therefore, cannot escape liability for its failure to perform its statutory duty on the ground that it did not know that the rock was likely to fall. No duty was imposed upon the plaintiff to keep a careful watch to see that loose rock did not fall upon him. He had the right to rely upon the performance by the master of the statutory duty to inspect and keep the roof of the entries propped to prevent stone from falling. The theory of the defendant that it was only bound by ordinary diligence to furnish a safe place for its employes to work

would deprive the statute of all force. It is not to be assumed that the Legislature intended merely to declare that to be the duty which the common law already imposed upon the employer.

The rule is also well established that where an employe at work in a mine is injured by the falling of loose rock, the employer's liability depends not upon whether it had actual or constructive notice that the rock was loose, but upon whether it had failed to perform its statutory duty to secure loose rock from falling; the only matter of inquiry being whether the requirements of the statute had been complied with, and, if not, whether the injuries complained of were caused by such neglect. McAlester-Edwards Coal Co. v. Hoffar, 66 Oklahoma, 166 Pac. 740; Schwarzschild & S. Co. v Weeks, 72 Kan. 190, 83 Pac. 406; Little v. Norton Coal Co., 83 Kan. 232.

In 26 Cyc. 1117, the rule is stated as follows:

"Where a servant is employed in a mine, quarry, tunnel, pit, trench, or other excavation, the master owes him the duty to use ordinary and reasonable care and diligence to make his place of work as reasonably safe as the nature of the work admits of, and must comply with all statutory requirements which have been enacted ror the protection of the servant."

"The only matter of inquiry is whether the requirements of the statute have been complied with, and, if not, whether the injury complained of was caused by such neglect." Spiva v. Osage Coal Co., etc., 88 Mo. 68.

Taking this view of the law, there can be little doubt that the evidence was sufficient to authorize the verdict and judgment in favor of the plaintiff on the merits.

Errors of the class complained of in the remaining grounds for reversal, to wit, errors in the rejection of evidence offered by the defendant and errors in the instructions, do not, under section 6005, Rev. Laws 1910, constitute reversible error unless, in the opinion of the court, after an examination of the entire record, it appears that the errors complained of have probably resulted in a miscarriage of justice or constitute a substantial violation of a constitutional or statutory right. Of these grounds for reversal it is sufficient to say that we have carefully examined the entire record, and are convinced that the errors complained of have not so resulted.

The case was unusually well tried by both sides, and the record below seems to us to be unusually free from prejudicial error. In our judgment there is but one close question in the case, and that is the sufficiency of the evidence adduced by the plaintiff for the purpose of avoiding the settlement. Being satisfied on this point, in the view we take of the mining laws, the trial court committed no prejudicial error in ruling on the admission or rejection of evidence or in its instructions given to the jury. In these circumstances we are not disposed to disturb the verdict of the jury and the judgment entered thereon in favor of the plaintiff.

For the reasons stated, the judgment of the court below is affirmed.

RAINEY, C. J., HARRISON, V. C. J., and PITCHFORD, JOHNSON, McNEILL, BAILEY, and RAMSEY, JJ., concur.