[Civil No. 2714. Filed November 2, 1928.]

[271 Pac. 406.]

THE ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, a Corporation, Appellant, v. C. I. PETERSON, Appellee.

Messrs. Chalmers, Fennemore & Nairn, Mr. C. B. Wilson, Mr. E. W. Camp and Mr. Robert Brennan, for Appellant.

Mr. W. E. Ferguson and Mr. P. A. Sawyer, for Appellee.

McALISTER, J.—This is an appeal by the Atchison, Topeka & Santa Fe Railway Company from a judgment in favor of C. I. Peterson for damages for personal injuries received by him while in the discharge of his duties as an employee of that company.

The injury was received February 5, 1924, and on March 25th thereafter Peterson signed a written document in which, for a consideration of $1,000, he released and discharged the railway company from all claims he then had or might thereafter

have as a result of the injuries sustained by him at that time. As presented here, the case does not contest the fact of injury, nor the resultant right to damages, but raises the one question whether the release is valid, and therefore a bar to the cause of action. The position of appellee is that the release is null and void, and the reasons assigned are that his signature was obtained to it through false and fraudulent representations, made to him by the doctors and claim agents of the railway company, as to his physical condition, and that he was not mentally competent to contract with the company or anyone else concerning the satisfaction of his claim at the time he signed it. The position of appellant, upon the other hand, is that the release is valid, and consequently bars the cause of action, because appellee executed it without misrepresentation of any character on the part of the company's agents, was mentally competent to contract, and fully understood the purport of his act in attaching his signature.

The injury was received in this way: As the westbound freight upon which appellee was a brakeman passed through Flagstaff, Arizona, about one o'clock in the morning, he was sitting in the cupola of the caboose, his head and shoulders out of the window, so he could better observe the train and the order board for signals, and, as the caboose was about one hundred and fifty or two hundred feet west of the depot, he was struck in the upper right temple and knocked unconscious by a water-crane, which the company maintained between the two main tracks, and which at the time was so out of repair that it swung nearly three feet out of position and within about four inches of a train passing over the south main track. Within a few minutes after it occurred, Harry Carter, another trainman in the caboose, discovered it and immediately took appellee from the cupola and placed him on a bunk, in which position he was carried

on to Williams, where he was removed to the Harvey House and attended by Dr. Melich, the railway physician at that place, until a little past noon of that day, when he was put on a passenger train and taken back to Winslow.

Upon the advice of Dr. Brown, the company physician there, he was taken the following day to the hospital of the Santa Fe Coast Lines Association in Los Angeles, where he remained ten days or two weeks under the care principally of Dr. A. Tyroler, assistant surgeon at that hospital, and chief surgeon for the Santa Fe Railway Company. At the end of this period, acting upon the advice of the latter that he would be all right in a short time, he returned to Winslow, but after being there about two weeks was advised by Dr. Brown to return to Los Angeles for further treatment, and he did so immediately, Mrs. Peterson accompanying him. Upon arriving there, Dr. Tyroler examined him again, and immediately afterwards sent him to Dr. Rand, a brain specialist, for further examination. Two days later Mrs. Peterson and he called at Dr. Tyroler's office to learn Dr. Rand's findings as to his condition (the latter having told them he would report to the former), and were told by Dr. Tyroler that there was nothing seriously wrong, and that he would be all right in thirty days.

From there they went to the office of the general claim agent of the Santa Fe Company, having promised the adjuster at Winslow, Mr. Anderson, that he would do this while in Los Angeles, and was invited into the office of E. C. Brun, senior claim adjuster, his wife remaining in the reception-room. They discussed the matter of a settlement for nearly an hour, after which they entered the office of the chief claim adjuster, F. A. Kelly, and talked with him for some minutes, when Mrs. Peterson was called in and the release executed by appellee under

date of March 25, 1924, a draft for $1,000 being delivered to him at the same time. The execution of the release was witnessed by Mrs. Peterson, E. C. Brun, and F. A. Kelly, and in its body in appellee's handwriting appear these words:

"I have read the above voucher, receipt and release, and fully understand the same."

Brun and Kelly testified that appellee knew fully what he was doing, and dickered with them for the best settlement he could obtain, the former suggesting to him that he had told the claim agent in Winslow, Mr. Anderson, that he would settle for $500, but he insisted on $1,000, for the reason that, though advised by the doctor that he could return to work in thirty days, it was problematical whether he would be able to do so, and, if he were, it might be necessary for him to take light work. Finally it was agreed that this amount should be paid.

According to the testimony of appellee, the settlement was made and the release executed because he believed at the time that he would be all right in thirty days, and this belief was produced principally by the statement of Dr. Tyroler that he would be, and to some extent by his own feeling that he was getting along very well. He testified:

"After I had been examined by the brain specialist I had to report to Dr. Tyroler to get the findings of the brain specialist. I did report to him and he instructed me that they found nothing wrong with me and all I needed was to take a vacation as I stated before. He stated that I would be over my injury in a short while; that they found nothing wrong and all I needed was to get my mind off of it. I was released to go to work in thirty days. I did not go to work. . . . I believed Dr. Tyroler's statement that I would be all right within thirty days. When I left Dr. Tyroler's office I went to see the claim agent. . . . I did not ask Dr. Tyroler to let me examine the report [of the brain specialist]. I did not read it over at any time. I was depending upon

my own feelings to a certain extent. I thought I was getting along very well."

Mrs. Peterson testified:

"When we left Dr. Tyroler's office, we started to leave the building and Mr. Peterson said, 'I promised Mr. Anderson to stop in the claim agent's office.' When I asked [Dr. Tyroler] about his condition he advised us to take a vacation and I asked about C. I.'s condition. Told him I was worried, and he said it was all unnecessary worry on my part. That from the examination made and different things he had found he thought C. I. would be all right in thirty days, but he advised a vacation if we had any one to visit in the East. I told him he was not himself and had not been since the injury, and he said, 'What do you mean?' and I said, 'I don't know how else to describe it,' and he said, 'It is all unnecessary worry on your part. He will be all right in thirty days.' From Dr. Tyroler's office I went to the anteroom of the claim agent's office. Mr. Peterson was with me."

That both Dr. Tyroler and appellee were mistaken as to his condition is clear from the evidence, which discloses that he was not all right within thirty days, nor even within the period elapsing between then and the trial, which was about three years later. In fact, it was admitted at the oral argument that he was in worse condition at the time the release was executed than he himself or the doctor thought he was, and in order that the correctness of this may appear a brief statement of the facts relating thereto from almost immediately thereafter until the trial follows:

Upon giving the release, he returned to his home in Winslow, and was there only a few days before his condition, both mental and physical, became such that Dr. Brown advised that he be taken away for a while. Pursuant to this advice, Mrs. Peterson took him to St. Louis early in April to visit a sister, and he returned from there the latter part of June, and

within a few days went to the hospital in Los Angeles to ascertain whether his condition would permit him to return to work, the result being that he was told by the doctor it would. Hence, about the middle of July he took a place as head-end brakeman on a passenger train, which was considered light work, but by the latter part of the following January his condition had become such that it was advisable that he make a fourth visit to the hospital for examination, and was advised this time by its physicians to go to a low altitude and follow light work involving no responsibility. Instead, however, he continued as brakeman for a few weeks, or until the 23d or 24th of February, 1925, when he was compelled to quit, and, accompanied by Mrs. Peterson, left immediately for the Mayo Clinic at Rochester, Minnesota, where he remained about a week, after which he and his wife went to Oklahoma City, where his parents resided. Mrs. Peterson remained there with him until some time in April, when she returned to Winslow, leaving him with his parents because, she testified, "neither the children nor I could be with him. It was absolutely impossible." From then until the trial about two years later he was unable to work, and remained with his parents, making in the meantime one trip to Winslow. As to his condition while she was with him in Oklahoma City she said:

"Absolutely no improvement; grew worse all the time, and it got to the point where I could not be with him at all. I had to stay in his sister's room all the time, because he was just wild when he heard my voice or footsteps, and they whispered to me when they talked. When his sister came home at night, and I would go with her for a walk, I had to sneak in and out and go to bed that way. We were riding one day and as a usual thing I could not go along. This day I went and his sister drove the car. We had gone quite a little ways and drove to the side of the road, and he directed his sister

to get out and while she was out he took the wheel and took us down an embankment in the car and then turned and looked at me. I don't know that I did anything at all that would cause him to have that feeling toward me and the children. Before the injury he most certainly did not treat me that way. There was no trouble between Mr. Peterson and myself before the injury. Mr. Peterson complained of his head feeling as if it were crawling or felt of bugs. He said it crawled and crawled (indicating with fingers). He knew it would finally work off the end of his nose and if it fell off the end of his nose it would be all right.''

Dr. John R. Walls, of Winslow, who examined him in February, 1926, and again just before the trial in 1927, testified as follows:

''From my examination of him and considering his previous employment, I could not pass him to any employment in any form of industrial work at the present time. It is very difficult to estimate about how long before he would be able to return to his former work. These peculiar types of injury to the head and brain are most peculiar in their after effects and sometimes it is a very long time before recovery comes. There may be at times partial recovery and a man will go to work and will break down and be out for some time and go to work and break down again for a period of years. I would not like to say that he would be able to take up his old work or similar work in anywhere from five to ten years. There is a possibility he might earlier than that, but I would not venture an opinion in less time than that, if he ever recovers fully.''

Dr. Henry W. Woltman, for eight years associated with the department of neurology at the Mayo Clinic, who examined him early in 1925, said:

''Judging from my examination and my knowledge of such injuries as I found on Mr. Peterson, I am unable to say what the ultimate outcome will be; many of these patients get well; some develop a chronic psychosis or psychoneurosis, and we have had some patients come to autopsy at which time a diffuse gliosis (growth on nervous tissue) was

found. . . . It was my opinion that Mr. Peterson probably suffered from some injury to his brain."

The verdict for appellee in the sum of $11,484, upon which credit for the $1,000 paid for the release was given in the judgment, shows that the jury was convinced that the release should be held of no effect, and under the evidence and the instructions this result could have been reached only upon the theory that appellee executed it under the mistaken belief that his condition was such that he would be all right within a short time, namely, thirty days, and that this belief was induced in him principally by the statement of Dr. Tyroler to that effect.

Appellant contends, however, that the evidence fails to disclose any legal reason for invalidating the release, and each of the eighteen errors assigned by it, except two, is directed to this one proposition. Its position, as well as that of appellee, will appear from a consideration of assignment 8, which is based upon the following instruction:

"You are further instructed, gentlemen of the jury, that the settlement and release of the cause of action brought about by false representation by a physician representing the defendant, A. Tyroler, of material facts, to wit, that the plaintiff would be all right within thirty days, if you find that such representations were made and that said A. Tyroler was representing the defendant at that time as its servant and agent and that the plaintiff relied thereon to his injury and executed the release, and would not have executed said release except for said representation made by said physician, it is not necessary that the falsity of said representations, if you find they were false, so made by said A. Tyroler, was known to him at the time he made the same; and if you so find, the plaintiff in this action would not be bound by said release, although there was no fraud or other wrongful intent on the part of said A. Tyroler to deceive or defraud the plaintiff at that time."

It is contended that this instruction is erroneous because it fails to include all the elements necessary to constitute actual fraud, the kind that must be established before it can be held to justify the setting aside of the release. The statement upon which appellee relies to nullify the settlement is the representation to him by Dr. Tyroler "that he would be all right within thirty days," and it is claimed that this is not the representation of a material existing fact, but merely the expression of an opinion. Considered, however, in connection with the other statements made at the same time, namely, that "they found nothing wrong with me," that "all I needed was to take a vacation and get my mind off of it," and that "I would be over my injury in a short while," it was more than the expression of an opinion; it was a statement of his condition at that time, an existing, material fact, upon which he had the right to rely. "The statement made by the doctor," said the court in *Granger* v. *Chicago, M. & St. P. Ry. Co.*, 194 Wis. 51, 215 N. W. 576, in which both plaintiff and claim agent had been informed by the doctor employed by the company to treat plaintiff that his condition was such that he was able to assume light work, "as to the condition of the plaintiff and his prospects of recovery is not a mere expression of opinion as to future events. It was a representation as to existing facts upon which both the plaintiff and the company had the right to rely. *Brown* v. *Ocean Accident Corp.*, 153 Wis. 196, 200, 201, 140 N. W. 1112; *Dominicis* v. *United States Casualty Co.*, 132 App. Div. 553, 556, 116 N. Y. Supp. 975; *St. Louis R. Co.* v. *Hambright*, 87 Ark. 614, 113 S. W. 803, 807." *Chicago, R. I. & P. Ry. Co.* v. *Burke*, 73 Okl. 258, 175 Pac. 547; *Pattison* v. *Seattle, R. & S. Ry. Co.*, 55 Wash. 625, 104 Pac. 825.

A further objection to the instruction is that it expressly permits the setting aside of the release

if the representation of Tyroler was false in fact, even though its falsity was unknown to him at the time. It is argued that the falsity of a representation as an element of fraud is immaterial, unless known to the person when he made it; that is, unless he knowingly misrepresents the facts. It is true that, when actual fraud must be shown, as in the old common-law action of deceit, no recovery can be had unless intentional deception appears, and many authorities hold to the strict application of this rule wherever relief is sought upon the ground of fraudulent representation; but, since an unintentional fraud often results in as great injury to the person defrauded as an intentional one, the courts have qualified the rule in such a way as to permit the granting of relief in actions whose purpose is to restore to a party that with which he has parted, and which are founded upon a contract induced and brought about by representations false in fact, though made in good faith. It must, of course, be true also that the representations are material, not merely opinions, and of such a nature that the defrauded party was justified in relying on them. In denying the contention of the defendant that, before plaintiff was entitled to rescind the release, it was necessary for him to show that he was induced to execute it by the intentional deception of the physician and claim agent, the Supreme Court of Minnesota in *Jacobson* v. *Chicago, M. & St. P. Ry. Co.*, 132 Minn. 181, Ann. Cas. 1918A 355, L. R. A. 1916D 144, 156 N. W. 251, said, among other things:

"In such cases the courts grant relief either upon the ground of fraud in law, sometimes spoken of as constructive fraud, or mutual mistake. It is not material whether it be termed fraud in law or mistake; the result is the same in either case. The rule now often applied is tersely summed up by the Iowa Supreme Court in the statement that: A 'party cannot falsely assert a fact to be true and induce an-

other to rely thereon to his prejudice, and thereafter hide behind the claim that he did not know it was false at the time he made it.' *Haigh* v. *White Way Laundry Co.*, 164 Iowa 143, 50 L. R. A. (N. S.) 1091, 145 N. W. 473.''

In *Granger* v. *Chicago, M. & St. P. Ry. Co., supra,* plaintiff executed a release for a consideration of $500 in the belief, induced by the advice of the physician, that ''he was pretty well along toward being cured,'' and in so doing both he and the claim agent acted under a mutual mistake of fact as to the extent of his injury and duration of his disability. In concluding that it would be most unjust to hold the release binding upon plaintiff, when he was in such a serious physical condition that the railway company did not question that $12,000 was a fair measure of damages sustained by him, the court said:

''While there is a conflict in the decisions, we believe that the greater weight of authority, as well as the sounder logic, supports the rule that a release will be avoided on the ground of mistake of fact where the doctor gave the advice in good faith believing the same to be true, as well as where he acted in bad faith for the purpose of inducing a settlement. *Jacobson* v. *Chicago, M. & St. P. R. Co.,* 132 Minn. 181, Ann. Cas. 1918A 355, L. R. A. 1916D 144, 147, 156 N. W. 251.''

In *F. Kiech Mfg. Co.* v. *James,* 164 Ark. 137, 261 S. W. 24, paragraph 4 of the syllabus contains the following statement of the holding of the court on this point:

''Where plaintiff, injured in defendant's employment, signed release, relying on mistaken opinion of defendant's doctor that his injury was not permanent, he was not bound thereby, notwithstanding recital that he acted wholly on his own judgment as to nature and extent of injury, and that no representations were made on which he relied.''

See, also, the following authorities on this proposition: *St. Louis, I. M. & S. Ry. Co.* v. *Morgan,* 115 Ark. 529, 171 S. W. 1187; *Texas Employers' Ins.*

*Assn.* v. *Rodgers,* (Tex. Civ. App.) 284 S. W. 968; *Houston & T. C. R. Co.* v. *Brown,* (Tex. Civ. App.) 69 S. W. 651; *Great Northern Ry. Co.* v. *Fowler,* (C. C. A.) 136 Fed. 118; *Chicago, R. I. & P. Ry. Co.* v. *Burke, supra; Ladd* v. *Chicago, R. I. & P. Ry. Co.,* 97 Kan. 543, 155 Pac. 943; *Pattison* v. *Seattle, R. & S. Ry. Co., supra; St. Louis-San Francisco Ry. Co.* v. *Cauthen,* 112 Okl. 256, 48 A. L. R. 1447, 241 Pac. 188; *Parrott* v. *Atchison, T. & S. F. Ry. Co.,* 111 Kan. 375, 207 Pac. 777; *Malloy* v. *Chicago Great Western R. Co.,* 185 Iowa 346, 170 N. W. 481.

It is claimed, further, that a return of the $1,000 paid for the release, or a tender thereof, was a condition precedent to appellee's right to bring the action and that, inasmuch as this was not done, the cause cannot be maintained. There is, it is true, a difference in the decisions on this proposition but the weight of authority, as well as the better reasoning is that where the release was secured through fraud, repayment of the consideration therefor, or a tender thereof, is not a requisite to the maintenance of the action. *St. Louis-San Francisco Ry. Co.* v. *Cox,* 171 Ark. 103, 283 S. W. 31; *Franklin* v. *Webber,* 93 Or. 151, 182 Pac. 819; *Koshka* v. *Missouri Pacific R. Co.,* 114 Kan. 126, 217 Pac. 293; *Vanormer* v. *Osborn Machine Co.,* 255 Pa. 47, 99 Atl. 161; *Wangen* v. *Upper Iowa Power Co. et al.,* 185 Iowa 110, 169 N. W. 668; *Edwards* v. *Morehouse Stave & Mfg. Co.,* (Mo. App.) 221 S. W. 744; *Smallwood* v. *St. Louis-San Francisco Ry. Co.,* 217 Mo. App. 208, 263 S. W. 550; *Smith et al.* v. *Atchison, T. & S. F. Ry.,* (Tex. Com. App.) 232 S. W. 290. Some of the decisions base their ruling upon the ground that it would be useless to require a tender where it would be refused, as in the case of the releasee who claims that the release is valid, while others place it upon the ground that the restoration of that which one is entitled to retain in any event, either as a result of

the agreement sought to be set aside or of the original liability, is never·required. Both of these grounds are applicable here, for the reason that appellant insists that the release given by appellee is valid, and the court gave it credit on the judgment for the $1,000 paid therefor.

It follows that the instruction is a correct statement of the law, for it is clear from the record that the jury was justified in concluding that appellee executed the release under the belief that his injury was not serious, that he would be all right within thirty days, that this belief was brought about through the statement of Dr. Tyroler to that effect, and that it was not true. Whether it was made in good faith or with intent to defraud is immaterial, the effect upon appellee was the same, and under the authorities he would be entitled to relief upon the ground of constructive fraud or mutual mistake, even though his intention was not to deceive.

After the jury had been qualified, but before it was sworn, appellant requested the court to try what it termed its plea in bar—that is, the validity of the release—before taking up the matter of its liability for damages, the amended reply having alleged that the release was obtained through fraud. The request was denied, and this ruling forms the basis of assignments 17 and 18, the contention being that it was highly prejudicial to appellants to determine in the same action its liability for damages and the validity of the agreement releasing it therefrom, for the reason that its rights growing out of the release were lost sight of or disregarded by the jury, because it believed the appellant was liable in the first instance, and that the amount paid him was inadequate compensation for his injury. Such a course, it is argued, amounts in fact to an exhibition of sympathy with suffering, and to prevent injustices of this character was the motive which

prompted the enactment of paragraphs 485 and 509, Civil Code of 1913, the first providing that "pleas shall be heard and determined in due order of pleading under the direction of the court," and, the second that "all issues of law arising on the pleadings, and all pleas in abatement and other dilatory pleas remaining, and all pleas which do not go to the merits of the case shall be disposed of by the court before the case is called for trial on the merits."

A plea of release is a plea in bar, but it is claimed that it is one that does not go to the merits of the case. The effect of sustaining such a plea would not have been merely to delay the remedy, as would have been true of a plea purely dilatory in character, but would have resulted in defeating appellant's action altogether, and a plea having this effect goes to the merits of the case made by the pleadings. The term "merits of the case" does not refer to the issues presented by the complaint and answer alone, but to those made by the pleadings as a whole, after all the issues of law arising on the pleadings and all dilatory pleas have been disposed of. To say that the validity of the release should have been tried first, merely because to have done so would have rendered any further hearing on the case unnecessary, in the event that the agreement was held valid, is equivalent to saying that any plea by way of confession and avoidance must upon request be heard before taking up the question of liability on the original cause of action, and this notwithstanding the fact that holding the release invalid would necessitate a second trial to dispose of the question of liability in the first instance.

Such procedure would lead to multiplicity of suits, and it was not the purpose of paragraph 509, *supra,* to bring about such a result. It is not necessary, therefore, that the plea of a release, which it is alleged was obtained through fraud and has the

effect of wholly defeating plaintiff's cause of action, be tried separately from the other issues in the case. If an action is brought in the first instance by the releasor for the specific and only purpose of rescinding the release because of fraud in procurement, that issue alone would of course be heard. *Manchester Street Ry.* v. *Barrett*, (C. C. A.) 265 Fed. 557; *Union Pacific R. Co.* v. *Whitney*, (C. C. A.) 198 Fed. 784; *Wilson* v. *San Francisco-Oakland Terminal Rys. et al.*, 48 Cal. App. 343, 191 Pac. 975; *Clark* v. *Northern Pac. Ry. Co.*, 36 N. D. 503, L. R. A. 1917E 399, 162 N. W. 406. In *Quapaw Mining Co.* v. *Cogburn*, 78 Okl. 227, 190 Pac. 416, the court says:

"It is well settled in this jurisdiction that where personal injuries have been suffered, for which a liability exists, and a release therefor has been fraudulently procured for a grossly inadequate sum, an action for damages may be maintained without first obtaining a decree to rescind or to cancel the release."

The judgment is affirmed.

ROSS, C. J., and LOCKWOOD, J., concur.