[Civil No. 1857. Filed June 7, 1921.]

[198 Pac. 457.]

# PACIFIC GAS & ELECTRIC COMPANY, a Corporation, Appellant, v. ANGEL ALMANZO and DOLORES ALMANZO, Appellees.

1. Fraud—Whether Statement is Opinion is for Jury.—As a general proposition, the expression of an opinion which is understood to be only an opinion does not render one liable for fraud; but, where it is impossible to determine as a matter of law whether a statement is a representation of a fact which the defendant intended should be understood as true of his own knowledge or an expression of opinion, the question is one for the jury.

2. Appeal and Error — Findings on Conflicting Evidence Conclusive.—Findings of a jury based on conflicting evidence are conclusive upon the Supreme Court on appeal.

3. Appeal and Error—Scope of Review of Findings That Statements Constituted Fraudulent Representations of Fact.—The Supreme Court on appeal from a judgment involving finding that certain statements were fraudulent representations of fact, and not mere opinions, can only determine as to whether the statements were such that one might reasonably infer from them, taking into consideration all the circumstances surrounding their utterance, that it was intended by the one who used them that they should carry to the persons to whom they were spoken the weight of spoken facts, and not be regarded merely as the expression of opinion.

4. Release—Statement of No Cause of Action may Constitute Fraud Vitiating Release.—If employer of plaintiff's son represented to plaintiff, in order to prevail on him to execute a release of damages arising from the son's death, that plaintiff had no cause of action against defendant, and that the accident was the boy's fault, without believing such representations to be true, and plaintiff believed such representations and so believing executed the release, such representations constituted fraud and vitiated the release, if the representations were false.

5. Release—Statement That Father of Wrongfully Killed Son Would have to Pay Funeral Admissible on Question of Fraud in Obtaining Release.—In an action to recover damages for the death of a son, it was proper for the jury to consider a statement of defendant's representatives, "If you do not sign that paper you will have to pay the funeral," referring to a release, on the

question of fraud in obtaining the release, which provided for payment of funeral expenses by defendant.

6. RELEASE—EVIDENCE HELD TO SHOW FRAUD IN OBTAINING RELEASE FROM PARENTS OF DECEASED SERVANT.—In an action under the Employers' Liability Law to recover damages for death of a son, evidence *held* sufficient to sustain the finding of the jury that a release was obtained from plaintiff by fraud. .

7. DEATH—LOSS TO PARENTS.—In an action under the Employers' Liability Law to recover damages for the death of a son, parents are entitled to have the jury consider in fixing damages what the parents would probably receive from the son after reaching his majority, as well as previous to that time, and this is to be determined by consideration of the boy's treatment of his parents, his health, his habits, his industry, and his ability and inclination to help his parents.

8. TRIAL—ERRONEOUS INSTRUCTION ON LAW OF CASE MUST BE FOLLOWED BY JURY.—An instruction, although erroneous, is the law of the case until reversed, and should be followed by the jury, even though in doing so a verdict which accords with its ideas of right cannot be returned.

9. TRIAL—REVERSIBLE ERROR WHERE JURY DOES NOT FOLLOW INSTRUCTION THOUGH ERRONEOUS.—Where a jury in assessing damages does not follow the court's instruction as to the measure of damages, and awards damages which would be excessive under the instruction as given, a judgment based thereon must be reversed, since the jury cannot constitute itself a judge of the law as well as the facts.

10. DEATH — THREE THOUSAND DOLLARS HELD NOT EXCESSIVE FOR DEATH OF NINETEEN YEAR OLD SON.—A verdict of $3,000, in addition to $800 expended by defendant under a release fraudulently obtained, was not excessive for the death of a son nineteen years of age, strong and well and industrious, who regularly gave his mother his earnings, amounting to $3 per day, for the support of the family, under the Employers' Liability Law.

APPEAL from a judgment of the Superior Court of the County of Maricopa. F. H. Lyman, Judge. Reversed and remanded.

6. On right in an action at law to attack release for fraud, see notes in 13 Ann. Cas. 756, 20 L. R. A. (N. S.) 915.

10. On excessive or inadequate damages for personal injuries resulting in death, see notes in 18 Ann. Cas. 1209; Ann. Cas. 1915C, 449; L. R. A. 1915C, 820.

Mr. R. E. Sloan, Mr. C. R. Holton, Mr. E. G. Scott, and Messrs. Bullard & Jacobs, for Appellant.

Mr. T. J. Croaff and Mr. S. B. Pugh, for Appellees.

McALISTER, J.—This action was brought under the Employers' Liability Law (Rev. Stats. 1913, pars. 3153–3162) by Angel Almanzo and Dolores Almanzo, appellees, against the Pacific Gas & Electric Company, a corporation, appellant, to recover damages for the death of their minor son, Jesus Almanzo, and from a judgment for them in the sum of $3,000 and an order overruling its motion for a new trial, appellant appeals.

It appears from the complaint that appellant was engaged in erecting a building, the framework of which was iron and steel, and that in the prosecution of this work a derrick run by electric power was used for hoisting materials; that Jesus Almanzo, a boy about nineteen years of age, was employed as a laborer in connection with this work, and while in the performance of his duties as such laborer, on August 28, 1919, was seriously injured by the derrick's breaking and falling upon him, and that within a few hours thereafter he died from the injury; that the accident arose out of the employment and was due to a condition or conditions of such occupation or employment, and not to the negligence of said Jesus Almanzo; that said Jesus Almanzo was able-bodied, unmarried, without any estate, but was receiving $3 per day at the time of his death, and was the sole support of his parents, who had four other children, ranging from eight to seventeen years of age.

A general demurrer, which was overruled, a plea in bar, and a general denial constitute the answer.

XXII Ariz.—28

In bar of the action appellant alleged that on August 29, 1919, the appellees, Angel Almanzo and Dolores Almanzo, for a consideration of $800, made, executed and delivered to the appellant a release from any and all actions, causes of action, claims, or demands by reason of any damages or loss which they had sustained, or might thereafter sustain, in consequence of the death of their son. The release is in the words and figures following, to wit:

"In consideration of the payment of five hundred ($500) dollars, to us in hand paid by the Pacific Gas & Electric Company, the receipt whereof is hereby confessed and acknowledged, and in consideration of the further payment of the funeral expenses, not exceeding two hundred and fifty ($250) dollars, and the bill of the St. Joseph's Hospital, not exceeding twenty-five ($25) dollars, and the bill of Dr. Brockway, not exceeding twenty-five ($25) dollars, we, Angel Almanzo and Dolores Almanzo, father and mother, respectively, of Jesus Almanzo, deceased, a minor of the age of eighteen years, jointly and severally, do hereby release and forever discharge the said the Pacific Gas & Electric Company from any and all actions, causes of actions, claims, and demands for, upon, or by reason of any damage, loss, or injury which heretofore have been or which hereafter may be sustained by us or either of us in consequence of that certain accident occurring on or about August 28th, 1919, at the plant of the said the Pacific Gas & Electric Company in the city of Phoenix, county of Maricopa, and state of Arizona, wherein the said Jesus Almanzo sustained diverse injuries, both internal and external, resulting in his death.

"It being further agreed and understood that the payment of the said five hundred ($500.00) dollars and the further payment of the said funeral, hospital, and doctor expenses is not to be construed as an admission on the part of the said the Pacific Gas & Electric Company of any liability whatever in consequence of said accident.

"In witness whereof we have hereunto set our hands and seals, respectively, this 29th day of August, 1919.

"ANGEL ALMANZO.

her

"DOLORES  X  ALMANZO.

mark

"Witness to mark:

"LASSER H. GORNETZKY.

"W. C. HORNBERGER."

In their reply appellees admit signing the release, but allege that it was procured by duress, undue influence, fraud, and misrepresentation, and in support of such allegations set up:

That the release was presented to appellees at a time when the body of their son was unburied and while both of them were suffering great mental anguish and were weak from weeping, and that they were at said time incapable of resistance against the importunities made by defendants to compel them to sign the same; that at said time Lasser H. Gornetzky and W. C. Hornberger presented to them an instrument for their signatures and offered to pay them $500 and all the funeral expenses and doctor bills on account of the injury and death of their son; that these plaintiffs were then asked numerous questions by the said representatives of the defendant regarding their affairs, and refused at first to consider the release and requested said parties to leave them alone and come back some other time, which they refused to do; that "the defendant through its said representatives stated to these plaintiffs at said time that, if they did not take this money and sign the said release which they had presented to them that night, they would not have an opportunity to do so again, and represented to the plaintiffs that the death of the deceased was caused by his own fault, and that, unless they accepted the money and signed the paper at this time, they could recover nothing on account of his said death; that these plaintiffs did not know at said time that the said statement that the injury and death of the deceased was caused by

his own negligence was untrue, and did not know how same was caused, but relied upon the representations of the defendant aforesaid, which representations were untrue and fraudulent, and the plaintiffs only signed their names and accepted the said sums on account of relying upon the same; that, in fact, the deceased met his death while in due care for his own safety, and these plaintiffs have since learned that the defendant is liable to them under the liability act for damages in a large amount, as set out in their complaint; that at the time of signing said release these plaintiffs believed in and relied upon all the representations made by the defendant, and on account of the mental agony and suffering and weakness of will which they were undergoing at said time and in the death chamber, as aforesaid, and the persistence of said agents of the defendant, were not competent to fully consider the said matter and were unduly influenced and could not resist the said importunities to sign the said paper; that the said amount so received by them and for their benefit is inadequate and unconscionable and does not adequately compensate them for the damage received by them in the premises.''

The employment, its hazardous character, and the fact that the injury resulting in death was due to a condition of the employment, and not to the negligence of the deceased, are in no way contested. The defense, other than a claim that the award is excessive, is a settlement as evidenced by the release. The court eliminated the question of undue influence in procuring the release by instructing the jury that there was not sufficient evidence to sustain such charge, but submitted its procurement through fraud and misrepresentation. Appellant urges that the reply does not allege, nor does the evidence disclose, any facts establishing fraud or misrepresentation, for the reason that the allegation as well as the proof in substantiation of it is merely an opinion of the officers of the defendant company and is not there-

fore actionable. It is true as a general proposition that the expression of an opinion, which is understood to be only an opinion does not render one liable for fraud. *People* v. *Peckens,* 153 N. Y. 576, 47 N. E. 883; *Hedin* v. *Minneapolis Surgical Institute,* 35 L. R. A. 417, note. There are many exceptions to this general rule, however, for "it is often impossible to determine, as matter of law, whether a statement is a representation of a fact, which the defendant intended should be understood as true of his own knowledge, or an expression of opinion, and when such is the case the question is one for the jury." 12 R. C. L. 446, par. 190; *Stubbs* v. *Johnson,* 127 Mass. 219. "Each case must in a large measure be adjudged upon its own circumstances." *Hedin* v. *Minneapolis Surgical Institute,* above; *Reeves* v. *Corning* (C. C.), 51 Fed. 774. This necessitates a brief review of the facts concerning the procuring of the release.

The accident occurred about three o'clock in the afternoon, and the boy was immediately removed to the hospital, where he died about two or three hours afterwards. The father heard of the accident, went immediately to the plant, and then to the hospital where the boy had been taken. From there he went home, returning very soon afterwards to the hospital, where he remained until the boy died, about 6:30 o'clock, after which he returned to the plant to inform Mr. Hornberger, superintendent of defendant company, of the death, but did not find him. Someone at the plant, however, telephoned the superintendent of the accident and death, and that the father was there looking for him. He then went home, and in an hour or so Mr. Hornberger arrived there and took him to the company's office, where they found Mr. Aller, the general manager. Soon Lasser H. Gornetzky, who had charge of the claim department

of the Carl H. Anderson Insurance Agency, through which the defendant company had been insured covering injuries to its employees, arrived. At this meeting the death of the son, the funeral arrangements, and a settlement were discussed. Five hundred dollars and the funeral expenses not to exceed $250 or $300 were offered, and, according to appellant's testimony, was more or less tentatively agreed upon, though Angel Almanzo testifies:

"That night they wanted to fix—Mr. Aller told me they were all handling the job, and I was a pretty good old man, and they wanted to treat me good. I says, 'All right; thank you.' He said, 'I want these men to give you $500, and I am going to give you all the funeral, make you pretty nice funeral.' That is all I cared for then; I didn't ask for any money but they offered me $500. I left my wife home and my boy lying dead at the hospital at that time."

No papers of any kind were signed that night. From the office Mr. Hornberger took Almanzo to the undertaker's to arrange for the funeral, and about 8 o'clock the following morning from his house to the priest to make further funeral arrangements, and from there to the insurance office at the Adams Hotel, where the release was drawn up, after which Angel Almanzo, Mr. Hornberger, Mr. Gornetzky, and a Miss Kingsbury went to appellees' home, where the release was signed. Almanzo testifies concerning this occurrence as follows:

"When she made that mark my wife was like this, lying down on the rocking-chair like that; she was picked up from the floor shortly before we came. She was in this condition, and I set a small table close by her. I grabbed her hand when they told me that we had to sign, if we didn't we would have to pay all the expenses and wouldn't get anything, because it was my boy's fault. I believed it then, but after a while I found it wasn't true. That is the reason

I come to you people to get my case. I can swear that my wife never signed her name; she don't know— they told me that she had to sign; if we didn't, I wouldn't get anything. That man told me that, that man over there. . . . At that time I did not know the circumstances as to how he was killed."

The witness Manuela Roblez, a young woman in the Almanzo home at the time the release was signed, testified as follows:

"The next day after the accident I saw two men and one lady. I do not know whether these were the same two men or not; I know two men came up to their rooms and a lady came with them. The two men told Mr. Almanzo to sign the paper. They said to him the first time, 'You got the money to pay the funeral?' Mr. Almanzo said, 'No.' And the men told him, 'You don't sign that paper you don't get nothing, and you will have to pay the funeral.' He said it was the boy's fault. Q. Who said that? A. The mens. I don't know which one; one of those men over there."

After the release was executed and delivered, a check for $500 was delivered to appellees, and Mr. Gornetzky took Angel Almanzo to the bank and aided him in getting it cashed.

The witnesses for appellant denied that appellees were told, just before the release was executed or at any other time, that if they did not sign it, they would have to pay all of the funeral expenses and would not get anything because it (his death) was the boy's own fault.

It is not within the province of this court to say whether these statements were or were not made; that was purely a question of fact for the jury under the evidence submitted. It can only be determined by us whether they are such that one might reasonably infer from them, taking into consideration all the circumstances surrounding their utterance, that it was intended by the one who used them that they

should carry to the persons to whom they were spoken the weight of facts, and not be regarded merely as the expression of an opinion. According to Angel Almanzo's testimony, he was at the time greatly disturbed over the death of his son and in no condition to discuss a matter of this kind. His boy's body was yet unburied. He knew nothing of the circumstances of the accident, nor whether he had a cause of action, for, so far as the record discloses, he had talked with no one on the subject, and when told by the managing agents of the defendant company that it was the boy's fault, that he could not get anything, it seems clear that he might have thought this a fact, coming as it did from one who, he supposed, knew better than himself how the accident occurred.

"If the facts are not equally known to both sides, then a statement of opinion by the one who knows the facts best involves very often a statement of a material fact, for he impliedly states that he knows facts which justify his opinion."

"Sometimes a statement of an opinion is necessarily based upon a fact or carries with it such an inference of fact that it can be interpreted as a statement of fact, and where it is known to be false and made with intent to deceive, it may be actionable." *Olston* v. *Oregon Water Power & Ry. Co.*, 52 Or. 343, 20 L. R. A. (N. S.) 915, 96 Pac. 1095.

The fact that the matter was discussed with him even before the funeral arrangements had been made might have appealed to the jury as pressing the matter with undue haste and as being prompted by a desire to get the release before appellees had had an opportunity to consult counsel as to their rights, and, if this be true, the jury could have concluded that the statements that the accident was the boy's own fault and that appellees would get nothing out of it did not represent the real belief of those making them, but resulted largely from fear of the result of

an action and was intended to mislead. That they were not true is .conclusively shown by the jury's verdict and·by the implied admission of liability by the defendant's failure to offer any defense on the merits as well as by its payment of some consideration for the release. We think. the Supreme Court of Oregon, in the case of *Woods* v. *Wikstrom*, 67 Or. 581, 135 Pac. 192, correctly states the law in a situation of this kind in the following language, to wit:

"If the defendant represented to the plaintiff, in order to prevail on him to execute the release, that the accident was unavoidable, and that he had no cause of action against him, without believing said representations to be true, and the plaintiff believed said representations, and, so believing, executed the' release, such representations constituted fraud and vitiated said release, if the representations were false."

It was proper for the jury to consider the other part of the statement testified to by Angel Almanzo and Manuela Roblez, "If you do not sign that paper you will have to pay the funeral," on the matter of fraud, after the question of undue influence had been eliminated from the case by the court's instruction. It is true that appellees would have been compelled to meet the expenses of the funeral before they could have collected damages; yet in the sense that they would be out these expenses ultimately the statement was not true if appellees had a good cause of action, for in that event they would be recovered as a proper element of damage.

We are clearly of the' opinion that the evidence on the question of fraud is such that the court would not have been justified in refusing to submit the case to the jury as requested by appellant. We realize the correctness of the following statement by the Supreme Court of Washington in the case of *Cortez*

v. *Spokane International Ry. Co.,* 112 Wash. 289, 191 Pac. 820, to wit:

"Releases of this kind are like any other writing, and are not to be lightly overcome. If they are not induced by fraud, false representations or overreaching, they must be sustained. The testimony, to sustain the charge of fraud, must be clear and convincing."

Under the facts, however, we cannot say as a matter of law, contrary to the findings of the jury, that there was no fraud in procuring the signatures of appellees to the release.

It is urged that the judgment is excessive by practically the entire amount of $3,000, and in support of this contention appellant cites the fact that at the time of his death Jesus Almanzo was just nineteen years of age and earning $3 per day; that if he had lived he could not have worked over 600 days between the date of his death and the attainment of his majority, when his parents would no longer be entitled, as a matter of law, to his earnings; that at best he could have earned during this time a total of only $1,800, and from this should be deducted the $800 paid for the release, which would leave $1,000 to cover his own maintenance for a period of two years and the loss to appellees. This contention is based on the court's instructions that the loss of services for which appellees could recover is limited to the probable earnings of the son during his minority less the cost of his own maintenance, and on the further specific instruction that "the chances of survival and of his ability and willingness, if he should become of age, to support the plaintiffs, are matters too vague, uncertain, and remote to enter into an estimate of such loss."

As applied to the facts of the case, this instruction does not prescribe the proper measure of damage.

It is true that a child's earnings are his own after he becomes twenty-one years of age, and in a sense any service he may then render his parents is voluntary; yet that feeling of gratitude and affection in every dutiful child which leads him always to the succor of needy parents is recognized by that provision of the Employers' Liability Law which makes the employer liable in damages to the parents of a son (or daughter) who loses his life in the employment under circumstances giving rise to a cause of action, when neither widow nor children survive, and the fact that he is over twenty-one years of age will not in itself defeat such an action. The support the parents will probably receive from him after he reaches his majority, as well as previous to that time, is the proper guide, and this is determined by a consideration of the boy's treatment of his parents, his health, his habits, his industry, his ability and inclination to help his parents. If the boy is one who realizes his responsibility and desires to perform his filial duty to the extent of his ability, the attainment of his majority will in no way lessen his laudable efforts in this direction. Even when a boy of this character takes upon himself the responsibility of a family of his own, his sense of duty in this regard still remains, and is affected only by the limitation such increased obligation imposes.

At the time of his death Jesus Almanzo was nineteen years of age, strong and well, and industrious; he regularly gave his mother his earnings for the support of the family, and shortly before his death expressed a desire to join the army; one of his reasons for such a step being that he might learn something by which he could increase his earning power and thus be able to do more for his parents. These are evidently the considerations by which the jury was guided in arriving at the amount of its verdict,

for it is clear that the instructions on this subject were disregarded. Such a verdict could have been reached in no other way, for it cannot be figured that within the two remaining years of the son's minority he could have earned at the wages he was receiving at the time of his death a total of over $1,800; and if from this the cost of his own maintenance for that period be deducted there would remain at best only about $1,000 or $1,200. But appellees contend that the jury evidently felt that he might have increased his earning power sufficiently during the two years to earn within that time $3,000 above his own maintenance. It would hardly seem possible, however, that a boy nineteen years of age, following only ordinary labor, could so improve himself within such a short time as to enable him to earn as much more than he had theretofore earned as would be required to enable him to help his parents to the extent of $3,000, or would have made his estate at the end of two years, in case of his death at that time, worth to them $3,000 less the amount he might give them during that period. The instruction, although erroneous, was the law of the case until reversed, and should have been followed by the jury, even though in doing so a verdict which accorded with its ideas of right could not have been returned. Under our system of jury trial procedure the judge of the court determines the law of the case and the jury the facts, and to allow the jury to constitute itself the judge of the law as well as the facts would violate this fundamental principle. To affirm this judgment, however, it will be necessary to permit such a departure, but the fact that in this particular case it would lead to a proper result would not justify the establishment of such a dangerous precedent.

The only alternative to ordering a new trial is an affirmance of the judgment upon the filing by appel-

lees of a *remittitur* in the amount held to be excessive, but it would be manifestly unfair to them to compel them to remit a part of a judgment which is excessive only when measured by the wrong standard. Apply the proper rule, and the judgment is not excessive. Appellees are entitled to have a jury, guided by the proper measure of damage, say just how much they should receive as compensation for the death of their son.

The judgment of the lower court is reversed and the case remanded, with directions to grant a new trial.

ROSS, C. J., and BAKER, J., concur.