[Civil No. 2799. Filed April 26, 1929.]

[276 Pac. 846.]

INSPIRATION CONSOLIDATED COPPER COMPANY, a Corporation, Appellant, v. E. R. BRYAN and JULIA BRYAN, Appellees.

See Appeal and Error, 4 C. J., sec. 2891, p. 921, n. 67.
Death, 17 C. J., sec. 198, p. 1327, n. 4, sec. 200, p. 1329, n. 21, sec. 235, p. 1350, n. 7.
Master and Servant, 39 C. J., sec. 1265, p. 1045, n. 10.
Trial, 38 Cyc., p. 1786, n. 93.

Messrs. Rice & Mathews, for Appellant.

Messrs. Baker & Whitney and Messrs. Struckmeyer, Jennings & Strouss, for Appellees.

ROSS, J.—This is an action by plaintiffs E. R. Bryan and Julia Bryan, father and mother, under the Employers' Liability Law for damages for the death of their 20 year old son Allen Bryan, who, it is alleged, was killed on January 14th, 1914, in an accident due to the condition of his employment and arising out of and in the course thereof, while working for the defendant, Inspiration Consolidated Copper Company. The defendant's answer was a general denial. The trial, before a jury, was in December, 1927, and resulted in a verdict for plaintiffs in the sum of $18,750, upon which judgment was entered. Motion for a new trial was made, but overruled. From this order and the judgment, this appeal is prosecuted.

By a number of assignments the following questions are presented for our consideration and decision: (1) It is claimed that there is no evidence that deceased was in the employment of defendant at the time of his death, but that, on the contrary, all the evidence is to the effect that he was working for and under the control and direction of the United States:

(2) that the court misdirected the jury as to the law; and (3) that the verdict is grossly excessive. We will consider these questions in the order given.

The Roosevelt Dam is a government project. It was constructed under the United States Reclamation Act. After the dam had been completed, the water passing over it became available for power purposes and steps were taken by the government to convert such power into electrical energy for domestic and commercial uses. In the distribution of this energy, the communities within the boundaries of the project were, it seems, to be given first consideration, and accordingly power plants and transmission lines were installed for that purpose. The product exceeding the consumption within the project, a market for the surplus was sought. Outside of the project, some thirty-five or forty miles east of the Roosevelt Dam, were located the defendant and other mining companies engaged in mining copper and other metals. They needed electric energy for their mining operations and for domestic purposes.

On July 15th, 1912, the United States, by L. C. Hill, supervising engineer of the Reclamation Service, with the approval of the Secretary of the Interior, as the first party, and the Inspiration Consolidated Copper Company, as the second party, entered into an agreement by the terms of which the United States undertook and agreed to furnish the mining company electrical energy to operate its mining plant and for domestic purposes, upon conditions and terms therein named, provided the mining company would construct a transmission line and a telephone line from the power plant at Roosevelt to the works of the mining company. Throughout this contract the Inspiration Consolidated Copper Company is referred to as the "Contractor." While the contractor had other obligations under the contract, we give in particular those

concerning the construction of the transmission and telephone lines:

"It is understood and agreed that the Contractor shall construct .a double circuit, three-phase, forty thousand (40,000) volt transmission line from the Roosevelt Power Plant to the Contractor's Pumping Station at Wheatfields and Pumping stations and works near Miami, Arizona." Article VII.

"It is further understood and agreed that the Contractor shall install a telephone line in connection with the transmission line. . . . " Article IX.

"It is understood and agreed that the Contractor shall construct said telephone and transmission lines, together with all necessary appurtenances, including switching connections at Roosevelt, at its expense, in accordance with plans and specifications approved by the proper officers of the United States Reclamation Service and subject to their supervision. This work shall be promptly undertaken and vigorously prosecuted by the Contractor and finished within at least eighteen (18) months from the date of execution hereof. Upon its completion to the satisfaction of the Chief Engineer of the U. S. Reclamation Service, it shall become the property of the United States and form a part of the Salt River project. In consideration whereof the United States agrees to pay the Contractor the actual cost of said work, by crediting the Contractor with twenty-five per cent. (25%) of each monthly bill rendered for the amount of energy used by the Contractor as recorded in the recording watt-meters above provided, until the cost of said work is in this manner refunded and paid for. In the event that said work is not completed within the time above stipulated, the United States shall have the right and privilege to terminate this contract. . . . " Article X.

After the above contract was executed the transmission and telephone lines from Roosevelt Dam to defendant's property were constructed under an arrangement as follows: The engineer in charge of the Reclamation Service under the Roosevelt project, with equipment belonging to the government and persons

employed by him, did the actual work of building the lines, the defendant paying all the costs of materials and all wages of employees upon requisitions and pay-rolls furnished by said engineer or those working under him. It was in this way the deceased was employed and paid. The defendant phrases it thus:

"Aside from meeting the pay rolls of the men, and paying for materials procured or required by the government, as indicated, defendant had no part whatever in the work of constructing the transmission line."

While deceased was on top of one of the steel towers, engaged in fastening transmission wires to the cross-arms thereof, the guy-wire sustaining the tower broke, and the tower fell, taking him with it to his death.

Before the above contract was entered into, the responsible heads of the defendant mining company and the government met and discussed the proposed construction, its purpose, the amount and price of electricity to be delivered, and the manner and terms of paying for it by the defendant. In such discussion it was disclosed that the government had no funds available for such construction, and that, if it were done, the defendant company would have to *build* the lines or *finance* their building. Afterwards the engineers of the reclamation service drafted the contract and forwarded it to the Department of the Interior, where it was slightly changed, and, as changed, signed by the parties and approved by the Secretary of the Interior. It was a *building* or *construction* contract and not a *financing* one. No other contract was ever made or entered into with the sanction or approval of the Secretary of the Interior, and it is not contended or suggested that the supervising engineer of the reclamation service, or his assistants, possessed the power independent of the secretary to

make any other contract or to modify the one that had been made.

The arrangement that the actual construction of the lines should be done with the government's equipment and organization under the supervision and control of the reclamation engineers was later made between such supervising engineer and the general manager of the defendant.

It is contended by defendant that this arrangement was in conformity with the terms of the contract, that under the contract the obligation of defendant was to finance the construction of the lines, and not to construct or actually build them, and that it was so construed by the parties. We think it would be a perversion of the English language to give the contract any such meaning. It says:

" . . . The Contractor (defendant) shall construct a . . . transmission line . . . shall install a telephone line in connection with the transmission line . . . shall construct said telephone and transmission lines . . . *at its expense,* in accordance with the plans and specifications approved by the proper officers of the United States Reclamation Service and *subject to their supervision.*" (Italics ours.)

No plainer words could have been employed to place the duty, not only of constructing said lines, but also of financing such construction, upon the defendant. There is and can be no doubt as to whose duty it was to do the work and pay for it. Nor do we think there can be any doubt of the defendant's literally performing its contract "to the satisfaction of the Chief Engineer of the U. S. Reclamation Service." No one else agreed to construct at his expense said transmission and telephone lines. A reading of the contract will convince even a layman that the government was not to advance a dollar or contribute a lick of work towards the construction of the carrying

lines. It prepared the plans and specifications and reserved the right of supervision, and no more.

We have, then, this situation: The government did not agree to build the transmission and telephone lines, and did not in fact build them. It was not the employer of the men in the construction thereof. It was not liable for their wages nor the material used in the construction. In other words, the relation of master and servant did not exist as between the United States and the deceased and others working in the construction. The reclamation officers, with at most authority of "supervision," voluntarily and gratuitously proceeded, without any consideration whatever, to the United States, to superintend and direct construction work for the defendant. This was a splendid arrangement, at least for the defendant. It relieved it of the expense and responsibility of providing equipment and an organization to do the construction. It left the construction in charge of skilful and capable men familiar with that character of work. It assured to defendant, with the least possible trouble and expense, efficient and satisfactory transmission and telephone lines. But, did such a course of conduct relieve defendant of every obligation except to pay the men's wages and to pay for the materials used in the construction, as the defendant would now have us believe?

As we have seen, the United States was not the employer of the workmen nor the purchaser of the materials used, for the very obvious reason that the government had not agreed to do that particular work. When the government is taken out of the list of possible employers, there is left the defendant and the reclamation officers in charge. The latter were not the employers—did not pretend to be. They were acting either for the government or for defendant. The contract set the limit of their power to act for the

government. The voluntary donation of their skill, labor and experience to the defendant by the reclamation officers and the defendant's acceptance thereof, in legal contemplation constituted such officers the agents of defendant, and the workmen employed by them in the construction of the transmission and telephone lines the servants or employees of defendant. This conclusion, it seems to us, is inescapable. If the defendant was liable for the material and wages going into the construction, it would be liable in damages for injury to an employee when the injury was due to the condition of the employment. If it was not responsible for such damages no one was.

The construction was carried on in the only way a corporation could carry on such work, to wit, by and through its agents. The agent's control and direction reflect the corporation's will and disposition and not his. There is no doubt but that the defendant, it being the contractor, could have at any time supplanted the reclamation officers as superintendent of construction if it had so desired, and this without consulting their wishes or securing their consent. Under the contract, these officers had no right except the right of general supervision. Any other right or power exercised by them was extended or granted to them by defendant, and could be recalled or canceled at any time. The government had contracted for a finished or completed job to be done wholly by defendant. It was to assume no responsibility for the construction or for its payment until the lines were ready for use.

Defendant's argument in briefs and at the oral hearing assumed that the government was the employer of the deceased. This assumption is, as we have seen, without basis either in fact or law. It would be just as reasonable to claim the government was liable for the wages of deceased and others employed in

the construction as to .claim it and not defendant is liable for the injury to deceased. The possibility of the contention here made to evade contract liability we daresay was never thought of by the parties acting for the government and the defendant when the contract was made or during its performance, and we are quite sure the government would not have volunteered to lend its experts to defendant, as it did, if it had had the remotest idea that by so doing the defendant's liability as an employer would have been wiped out and that persons injured while working for it would be remediless.

We do not discuss the authorities cited by defendant for the rule applicable where there is an independent contractor involved or where there is a dispute as to who the employer is. Such cases have no place here, there being but one employer.

The facts here are undisputed, and we conclude therefrom, as a question of law, that there was but *one* employer, to wit, the defendant, that this employer acting by and through its agents, the officers of the reclamation service, discharged its duty of constructing and financing the transmission and telephone lines, and that the deceased was in its employment at the time he met his death.

This brings us to the instructions of which complaint is made. The first of these, given upon the plaintiffs' request, submitted to the jury for determination the question as to who was the employer of the deceased. The facts being undisputed and clearly showing deceased was employed by defendant and working under its direction and control when killed, it was error to give the instruction. But this was error in favor of defendant. It could not possibly have been prejudiced by it.

The next instruction of which defendant complains reads as follows:

"You are instructed, gentlemen of the jury, that while under the Employers' Liability Law of this state the plaintiffs have the burden of showing that the deceased, Allen Bryan, did not by his negligence cause his death, yet you shall not presume in the absence of evidence, that any negligence of Allen Bryan did cause his death. If the evidence fails to show that Allen Bryan's negligence did not cause his death, but also likewise fails to show that his negligence did cause his death, then it is to be presumed that his death was caused by natural or accidental means and was not suicidal."

"This instruction," defendant says, "is erroneous in law and has no relation to the issues made by the pleadings or the evidence. Consequently, it is confusing and misleading. The question of the negligence of Allen Bryan should have been submitted to the jury on the facts in evidence relating to that question and not upon any presumptions. If any presumptions were to be left to the jury, they should have been confined to the issues made by the pleadings and the proof." We concur in this criticism, and think the instruction had no place in the case. The evidence as to how the deceased came to his death is very clear. What killed him was the fall with the tower when it fell, and the reason the tower fell was because the guy-wire holding it in place separated or broke. That being true, there was no occasion for speculation or conjecture or guesswork or presumption. There is not the remotest suggestion of suicide in the evidence. The instruction might be correct as an abstract proposition of law, but it had no application to the facts. Just how the deceased came to his death was explained by eye-witnesses, persons who saw the whole transaction. There was no mystery as to the cause, nor is there a particle of evidence showing that deceased was negligent. In view of the evidence, and because in another place the court gave a correct instruction as to the burden of proof being

upon the plaintiffs to show that the deceased's death was not the result of his own negligence, we conclude that this instruction, although erroneous, was not harmful.

The Employers' Liability Law (par. 3158, Civ. Code 1913) designates those persons entitled to damages for death according to the following rule of priority: (1) Surviving widow or husband and children; and, if none, (2) the deceased's parents; and, if none, (3) the next of kin dependent on deceased; and, if none then (4) the deceased's estate. Allen Bryan left no widow or children but both of his parents, his father being 66 and his mother 46 years old at the time of his death, January 14th, 1914, with expectancy, respectively, of 10.2 and 23.8 years. Allen lacked a few days of being 20 years old when he was killed and had an expectancy of 42.21 years. The damages that may be claimed, by whatever rule measured, would be those accruing during the mother's expectancy or for the period of 23.8 years. Now the rule or measure of damages, where the claim is by and for the parent or parents, which is most generally if not universally adopted by the courts, is that amount the parent or parents would probably receive from the child after majority, as well as before, calculated upon the consideration of the child's treatment of his parents, his health, his habits, his industry, his ability and inclination and disposition to help his parents. *Pacific Gas & Electric Co.* v. *Alamanzo,* 22 Ariz. 431, 198 Pac. 457. This was the rule given to guide the jury in this case. Its correctness is not questioned. Damages under such a rule are not susceptible of mathematical demonstration. No figures can be accepted or assumed as a basis of calculation because of the variableness of the factors entering into the equation. Earning power may increase or decrease, solicitude for the parent wane or grow, industry and ability and character wax

strong. These are the intangible factors that enter into and necessarily give color to the verdict. After all, the common sense and fairness of the jury, seasoned and governed by experience and observation, is thought to be the best means as yet devised to estimate or calculate the amount of damages. No one has ever contended that the formula does exact justice; it is at best an approximation.

The cold and unvarnished facts submitted to the jury were these: That Allen Bryan, on January 14th, 1914, while engaged in doing the work he was employed to do, met his death through the fault of his employer in not furnishing him a safe place to work; that he was within 15 days of being 20 years old; that he had been earning wages for something like 2 years and had regularly given his pay checks to his parents during all that time; that such pay checks were for amounts from $58 to $73 per month, the latter being for December, 1913, the last full month before his death; that his checks represented all his earnings except board and lodging; that he was capable, healthy, industrious and a dutiful child, and by his contributions largely supported his mother and his aged father; that such support, instead of coming regularly to them, had been cut off, as above stated, for about 14 years, that being the lapse of time from Allen Bryan's death to the date when the jury returned the verdict, December 23, 1927.

These facts present an exceptional case. In the first place, Allen Bryan's conduct towards his parents is nothing less than remarkable. If his love and affection for them and his solicitude for their comfort and happiness are to be gauged by his generosity, they were one hundred per cent for he gave one hundred per cent of his net wages to them. In the next place, it is remarkable because of the length of time from the accident and death to the last trial, and the many trials and retrials during the interval. Two

juries before the last one had rendered verdicts against defendant, the first, June 8th, 1916, for $10,000, and the second, June 19th, 1925, for $7,500. This case on questions of procedure mostly, with this appeal, has been six times in this court. These old people, if entitled to anything, were entitled to it 14 years previous to the last trial. The law's delays, whether through the fault of the courts, or the mistakes of plaintiffs' attorneys, or the ability and skill of defendant's counsel in postponing a final adjudication, may have entered into the verdict to enlarge it beyond what it otherwise would have been.

We do not feel disposed to disturb the verdict. It may be large. Indeed, we think it is larger than we ourselves would have given had we been sitting as jurors, but, as indicated above, the facts in this case are so peculiar and exceptional that the decision, except upon a similar state of facts, cannot be regarded as a precedent.

But should resort be had to figures, the amount of the verdict can be justified, for, as was said in *Hollenback* v. *Stone & Webster Engineering Corp.*, 46 Mont. 559, 129 Pac. 1058, where the suit was by the mother for the death of her 19 year old son and the verdict was for $18,000: ''Based upon the wages he was then receiving and the reasonable probability that he would be able to earn, and would earn, wages equally as good or better during the expectancy of his mother's life, the amount written in the verdict is not beyond the legitimate limits indicated by the evidence.''

We have carefully and studiously examined the different assignments of error made by the defendant and the various legal propositions presented in their support. As indicated, we think much time of the lower court and of counsel was consumed in trying to build up a defense of no employment and no liability, whereas in truth and in fact there was nothing in the record to warrant such a defense. We think the facts

conclusively show that the defendant was the only employer engaged in the work of constructing the transmission and telephone lines from Roosevelt Dam to defendant's mines, and that it discharged its duty and obligation by utilizing, as every corporation must do, the services of individuals. This false and erroneous contention of defendant has been the whole stumbling block in this case. Properly it should never have been entertained by the trial court. The record discloses a case wherein the law clearly and unmistakably fixed the liability, the only serious question being the amount of that liability.

We find error in the record, but the serious error was to the injury of the plaintiffs and in favor of the defendant. None of the errors under the facts appear to have prejudiced the defendant.

The judgment is therefore affirmed.

LOCKWOOD, C. J., and McALISTER, J., concur.