641 P.2d 882

**Vera Warren LOVE, a married woman, Plaintiff-Appellant,**

v.

**HOME TRANSPORTATION COMPANY, INC., a Georgia corporation, Defendant-Appellee.**

**No. 1 CA–CIV 4941.**

Court of Appeals of Arizona, Division 1, Department B.

Aug. 18, 1981.

Rehearing Denied Sept. 30, 1981.

Steven M. Friedman, Phoenix, for plaintiff-appellant.

Burch, Cracchiolo, Levie, Guyer & Weyl, P.A. by Brian Kaven, Thomas G. Bakker, Phoenix, for defendant-appellee.

OPINION

JACOBSON, Judge.

This appeal involves the validity of a release. The trial court sustained the release against an attack on the basis of fraud and granted summary judgment against the plaintiff-appellant on her claim for personal injuries.

Most of the mainstream facts are uncontroverted. In the summer of 1976, J. D. Haygood, a truck driver employed by appellee, Home Transportation Company (Home), asked appellant, Vera Warren (now Love), to accompany him while he delivered a large piece of equipment to a mine in northern Arizona. Haygood was married and had a family living in Georgia. Plaintiff lived in Houston. She agreed to accompany Haygood on the trip.

The trip from Texas through New Mexico and into northern Arizona was generally uneventful. On August 23, 1976, as Haygood was driving the truck about two miles west of Tuba City, Arizona, and plaintiff was watching the scenery, there was a profound jolt and the tractor rolled over on its side and caught fire. Ms. Warren managed to extricate herself from the cab and was attended to on an emergency basis by a passer-by.

She subsequently learned that Haygood had died. The plaintiff suffered a broken bone in her left leg, burns on both feet and legs, and multiple lacerations and bruises as a result of the accident. She was briefly treated on an emergency basis in Tuba City and arrived at Flagstaff General Hospital at about midnight. She was given some form of medication for sedation and for pain reduction.

According to plaintiff's affidavit and deposition she experienced considerable pain and grogginess during the ensuing relevant three-day period at the hospital. On August 24, according to plaintiff, she was visited by Donna Hacht, an adjustor for the company which insured some portion of defendant's trucking operations.[1] There is conflicting testimony as to just what took place on this occasion. The adjuster returned again and it is undisputed that on this day, August 26th, the plaintiff signed a release which provided for payment to her of $6,500.00 immediately and an additional $3,000.00 for any medical expenses which might be incurred by her within six months of the accident. In return, the plaintiff released Home from any and all liability it

1. Ms. Hacht testified that she first visited the plaintiff on August 25.

may have as a result of the August 23, 1976 accident. This release was witnessed by Linda M. Peeler, a hospital social worker.

Since we must view the evidence in the light most favorable to the party against whom summary judgment was rendered, *Shea North, Inc. v. Ohio Casualty Ins. Co.,* 115 Ariz. 296, 564 P.2d 1263 (App.1977), we quote from the plaintiff's affidavit as to her version of the signing of the release and subsequent events:

> The next day the lady from the insurance company came back and asked a lot of questions, particularly harping on whether or not I knew I was not suppose to be on the truck. She also asked if I knew that JD was married and had a little girl. She told me that her insurance company didn't have to, but wanted to help me by giving me some money to pay my medical bills since I had been injured in a truck insured by them. She wrote out a release and I signed it. My main purpose in signing the release was that all I could think of was going home to Houston and I didn't have anything to do it with. All of my clothes, luggage, purse, with my identification and money, had been burned in the accident. All I had was a bra & blouse. Also, I couldn't see as my glasses were lost in the wreck. I am very near-sighted and had to go for about three (3) weeks without them. I had severe burns on both feet, particularly on my toes. I was told I might even loose [sic] two or three of my toes. My feet and legs also had burns on them and my left leg had been broken at the knee and I had a cast on it. Also my right arm between shoulder & elbow has burn scars & also scars are on left wrist & right hand & left thumb & wrist were numb. I had been working at the same job for about five (5) years but on about August 31, I was fired because they thought I would be out too long from my injuries. I was out of work until November 22, when I went to work part-time until March 7, 1977 at which time I again went into the hospital. I used most of the money from the insurance company to pay medical bills in Arizona, for clothes in Arizona and the airplane fare and taxi ride to get me home. I used the rest of it to live on until I was able to go back to work part-time as I could collect neither unemployment nor welfare. I still have pain in my toes, which are very sensitive. My thumb is numb and left inside tingles when touched. This is from 16 stiches [sic] taken when watch cut wrist. My left big toe is completely skin-graphed. [sic]. I still have swelling in my left leg and ankle and a dull constant ache in the left thigh. I am not able to walk or use my legs extensively. I have to put a pillow under my leg at night when I sleep and I still lose sleep. I cannot turn my head to the right completely and I have had recurrent headaches. I am only able to walk very slowly and after I sit awhile my left leg is very stiff causing me to walk with a limp. I cannot run, kneel or bend at the knee, or go downstairs normally nor can I wear shoes that are closed at the toe. The lady from the insurance company did, in the hospital, tell me that the accident was caused because JD had had a heart attack. It was not until almost a year after the accident that I learned that the accident had been caused by a defect in the gooseneck on the trailer we were pulling.

In regard to the "harping" reference above, the plaintiff points to the following testimony by the insurance adjuster:

Q. What law were you referring to when you asked her if she knew it was illegal for her to be in the truck?

A. I don't know, I'd just been told that by the trucking companies they are not supposed to take passengers with them, because it was illegal.

Q. You weren't referring to any specific law, were you?

A. No.

Q. You don't know whether it is illegal or not, except that the trucking companies have told you that it's illegal to take passengers,—

A. (Witness nods head.)

Q. —is that true?

A. Yes.

She wasn't supposed to go, I didn't know if she was aware of the law or not, she said she didn't know until she was on the road with him.

Following her return to Texas, the plaintiff applied for and received from Home's insurer the additional $3,000.00 for future medical expenses, making a total of $9,500.00 received by the plaintiff.

Home twice moved for summary judgment on the basis of the release in the trial court. On each of these occasions, the plaintiff opposed the motion on the basis that under the totality of the circumstances a trier of fact could conclude that the release had been fraudulently obtained. The trial court denied the initial motion, stating:

The Court FINDS that there are genuine issues of material fact concerning the issue of fraud in the inducement by Defendant Home Transportation's agent.

Thereafter, Home deposed the plaintiff and she stated that she would have signed the release even if Ms. Hacht had told her that the accident was due to equipment failure instead of J. D. Haygood's heart attack.[2] The trial court granted Home's subsequent motion for summary judgment on the basis that reliance on the alleged misrepresentation had been negated.

For summary judgment to be appropriate, there must be no genuine dispute as to material fact and the moving party must be entitled to judgment as a matter of law. Rule 56(c), Rules of Civil Procedure, 16 A.R.S.; *Dutch Inns of America, Inc. v. Horizon Corp.*, 18 Ariz.App. 116, 500 P.2d 901 (1972). The opposing party is entitled to all reasonable inferences which may be drawn from the facts viewed favorably to her and if there is the slightest doubt in regard to the material facts, the case must go to trial. *Livingston v. Citizen's Utility, Inc.*, 107 Ariz. 62, 481 P.2d 855 (1971).

In *Pacific Gas & Electric Co. v. Almanzo*, 22 Ariz. 431, 442, 198 P. 457, 460 (1921), our Supreme Court quoted the following passage found in *Cortez v. Spokane International Ry. Co.*, 112 Wash. 289, 191 P. 820 (1920):

Releases of this kind are like any other writing, and are not to be lightly overcome. If they are not induced by fraud, false representations or overreaching, they must be sustained. The testimony, to sustain the charge of fraud, must be clear and convincing.

In *Melvin v. Stevens*, 10 Ariz.App. 357, 360, 458 P.2d 977, 980 (1969), we stated:

It is true that a release, or other contract, may be rescinded where it was entered into under conditions of fraud or mutual mistake. *Atchison Etc. Ry. Co. v. Peterson*, 34 Ariz. 292, 271 P. 406 (1928); *Dansby v. Buck*, 92 Ariz. 1, 373 P.2d 1 (1962). However, the party attacking the contract has the burden of establishing the vice which he alleges induced it, and a mere preponderance of the evidence is inadequate. The evidence of fraud or mistake must be clear and convincing. Where fraud is alleged, there must be a misrepresentation of a material fact by the defendant or his agent, which was relied upon by the plaintiff in signing the release. If the misrepresentation is intentional, actual fraud is involved; if unintentional, constructive fraud is involved. *Atchison Etc. Ry. Co. v. Peterson*, supra.

Plaintiff relies principally on two cases, *Pacific Gas & Electric Co. v. Almanzo*, supra, and *Lowther v. Hopper Truck Lines*, 92 Ariz. 344, 377 P.2d 192 (1962).

In *Almanzo*, claims personnel representing the appellant sought a release from the decedent's father prior to the making of funeral arrangements. They offered to pay

---

2. The plaintiff testified on questioning by Home's counsel:

Q. BY MR. KAVEN: Okay. You told us that Donna Hacht told you that J. D. had a heart attack, and that's what caused the accident. Am I right?

A. Yes, sir.

Q. Okay. What if she told you that there was something wrong with the tractor, and that's what caused the accident? Would you have taken the money from her anyway?

A. Yes, sir.

for the funeral while asserting that the accident was the decedent's own fault. In rejecting appellant's contention that the validity of the release should not have been submitted to the jury, the court stated:

The fact that the matter was discussed with him even before the funeral arrangements had been made might have appealed to the jury as pressing the matter with undue haste and as being prompted by a desire to get the release before appellees had had an opportunity to consult counsel as to their rights, and, if this be true, the jury could have concluded that the statements that the accident was the boy's own fault and that appellees would get nothing out of it did not represent the real belief of those making them, but resulted largely from fear of the result of an action and was [sic: were] intended to mislead. That they were not true is conclusively shown by the jury's verdict and by the implied admission of liability by the defendant's failure to offer any defense on the merits as well as by its payment of some consideration for the release. We think the Supreme Court of Oregon, in the case of *Woods v. Wikstrom*, 67 Or. 581, 135 P. 192, correctly states the law in a situation of this kind in the following language, to wit:

"If the defendant represented to the plaintiff, in order to prevail on him to execute the release, that the accident was unavoidable, and that he had no cause of action against him, without believing said representations to be true, and the plaintiff believed said representations, and, so believing, executed the release, such representations constituted fraud and vitiated said release, if the representations were false."

22 Ariz. at 440–1, 198 P. at 460.

In *Lowther*, the court summarized the relevant allegations of fraud as follows:

Plaintiff alleged that the actions of the insurance adjuster were fraudulent in that (1) the adjuster got the confidence of the plaintiff by professing great friendship for her and interest in her welfare; (2) the adjuster told the plaintiff he felt sorry for her and wanted to do all he could to get her compensation; (3) the adjuster told the plaintiff that the insurance company represented by the adjuster was a big company and that plaintiff could not afford to fight them; (4) the adjuster told the plaintiff that the company retained the best lawyers and if plaintiff hired a lawyer she would get nothing; (5) the adjuster told the plaintiff that even if plaintiff had a lawyer and was lucky enough to recover her lawyer would take most of the money and plaintiff would end up with less than the adjuster could get for her; (6) the adjuster told the plaintiff that the defendants were not legally liable for plaintiff's injuries but as the adjuster was sorry for her he would try to get the insurance company to pay her something; (7) that the plaintiff was in pain and was emotionally disturbed when the adjuster was influencing her; and (8) plaintiff alleged special damages of more than $2,600.00. She was paid a total of $2,100.00 by the insurance adjuster.

92 Ariz. at 345, 377 P.2d at 192–3. The court held that these allegations were sufficient to raise a question of fact as to whether the release was valid.

The plaintiff argues that the strict rules of the law of fraud need not be observed in cases involving releases, that is, she suggests that there need not be a concurrence of each of the nine elements set forth in cases such as *Nielson v. Flashberg*, 101 Ariz. 335, 419 P.2d 514 (1966).[3] While the strict law of actual fraud has been relaxed to the extent of eliminating knowledge of falsity and thereby permitting a

---

**3.** These elements are:

(1) A representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted upon by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; (9) his consequent and proximate injury.

101 Ariz. at 338–9, 419 P.2d at 517–8.

determination that there has been a constructive fraud, *Atchison, Topeka & Santa Fe Ry. v. Peterson*, 34 Ariz. 292, 271 P. 406 (1928), we find nothing in the cases altering the rule as to what constitutes operative fraud. Even though *Almanzo* and *Lowther* do not refer to the specific elements, we do not read them to the contrary. We agree with the plaintiff, however, that the existence or nonexistence of fraud must be determined in the context in which the charge arises, that is, in view of the circumstances in which the parties find themselves, including physical and economic straits.

Plaintiff specifically relies upon two asserted misrepresentations. The first is that Ms. Hacht told her that the accident was caused by J. D. Haygood's heart attack when in fact the accident was caused by equipment failure. In regard to this contention, we agree with the trial court that appellant's own testimony squarely negates the element of reliance.

The second asserted misrepresentation on which the plaintiff relies involves a passage from her deposition and the passage from Ms. Hacht's deposition quoted above. The passage from plaintiff's deposition is as follows:

> Q. What else did she say, and what else did you say?
>
> A. As far as I can remember, she said that from what I had told her about the accident, that they were not responsible to me for anything. And that they would give me a certain amount of money so that I wouldn't file any legal action against them.

Plaintiff's counsel appears to contend that we should infer from these passages a presumably efficacious intent on the part of Ms. Hacht to convey to the plaintiff the proposition that because she was or may have been an illegal passenger in the truck driven by Haygood, she could not recover for personal injuries. Counsel's specific contention is as follows:

> We respectfully submit that the allegations by the insurance adjuster were clearly intended to convince the Appellant of several things. One, that she,

Mrs. Love, was legally at fault in some way; two, that Appellee, Home Transportation Company, was not responsible; three, that Appellee, Home Transportation Company, was, for eleemosynary reasons, willing to settle anyway; four, that Appellant would have little chance of recovery otherwise. Certainly, it is up to a jury to decide whether Mrs. Love relied upon these representations in a reasonable fashion in accepting the offer of settlement that was made to her in her weakened condition in the hospital.

█ While it is our duty to give the plaintiff the benefit of all reasonable inferences from the testimony favorable to her, we are bound by the record developed. Certainly, if Ms. Hacht had made a misrepresentation of law to appellant, as for example if she had misstated a specific legal principle, such could constitute a necessary misrepresentation. *Pacific Gas & Electric Co. v. Almanzo, supra,* and *Lowther v. Hopper Truck Lines, supra; see also* Annot., 21 A.L.R.2d 272 (1952). But plaintiff never testified or averred that Ms. Hacht told her or led her to believe that her illegal status as a passenger would bar recovery. According to the plaintiff, Ms. Hacht only generally opined, based upon what plaintiff told her, that Home or the insurance company had no responsibility to her. In such a general form, the statement was clearly a nonactionable statement of opinion, rather than a representation of fact. If the opinion were in any way tied to passenger status, we would have a different case. But a mere general denial of liability, without any specification of reason, is insufficient to constitute a misrepresentation of fact. Our duty to grant to the plaintiff the benefit of inferences cannot be stretched into attributing to her that which she had every opportunity to say but did not say. We do not find the requisite misrepresentation.

This case differs in significant respects from both *Almanzo* and *Lowther*. Here, as opposed to *Almanzo*, the releasor was a participant in the occurrence. In *Lowther*, there were elements of ingratiating trust and confidence and palpable misrepresentation which are not present here.

We do not intend to place a general stamp of approval on the "rush release." When a release is signed shortly after an accident, in a hospital, the potential for mistake and legal fraud is high. The victim's injuries may be such that he is isolated from others so that he has no means of acquiring a broadened perspective on the matter. However, in the present case, we note that the plaintiff had access to the telephone and talked with her brother in New Jersey just before executing the subject release. We further note that plaintiff's counsel at one point indicated that he would be offering an affidavit of the hospital social worker who witnessed the signing of the release as a part of his showing in opposition to the motion for summary judgment, but that the only affidavit of the social worker in the file was offered by Home. It reads as follows:

I, LINDA PEELER, being first duly sworn, under oath, depose and say:

I was employed as a social worker assistant at Flagstaff Community Hospital in August of 1976. I recall witnessing Vera Warren sign a release that was presented to her by an insurance company employee. I believe the employee's name is Donna Hacht. I was satisfied that Vera Warren was not under duress to sign the release and that she understood it. If I had not been satisfied to this effect, I would not have witnessed the release. A copy of the release is attached to this affidavit as Exhibit 1 and my signature appears on the release. I thought the insurance company employee was very professional and did not pressure Vera Warren at all.

/s/ Linda M. Peeler

LINDA PEELER

On appeal, the plaintiff has also raised an issue as to whether her state of mind (the result of medication, grogginess, pain, etc.) at the time the release was signed should be considered in determining the validity of this release. While there is some question as to whether this issue was raised in the trial court, we note that following release from the hospital and while in Texas, the plaintiff demanded and received an additional $3,000.00 thereunder. There is no contention that at this time she was acting under a state of mind affecting her capacity. Such subsequent action, at least as to her original capacity to execute, constituted a ratification of the execution. *See Eccleston v. Edens*, 50 Okl. 237, 150 P. 882 (1915).

Affirmed.

HAIRE, P. J., and O'CONNOR, J., concur.